UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION


UNITED STATES OF AMERICA,      :      Case No. CR212-22
                              :            CR212-23
        Plaintiff,         :
                              :
vs.                          :
                              :
STEPHEN A. KEATING,         :      Brunswick, Georgia
                              :      September 5, 2013
        Defendant.        :      2:08 p.m.
_____:


CONCLUSION OF SENTENCING HEARING, RESTITUTION
BEFORE THE HONORABLE LISA GODBEY WOOD
United States Chief District Judge


APPEARANCES:

For the Government:      JENNIFER G. SOLARI
                      Assistant United States Attorney
                      22 Barnard Street, Suite 300
                      Post Office Box 8970
                      Savannah, Georgia 31412
                      (912) 652-4422
                      Jenna.Solari@usdoj.gov

For the Defendant:       C. NATHANIEL MERRITT, ESQUIRE
                      Merritt & Grinstead
                      Post Office Box 1610
                      Hinesville, Georgia 31313-8610
                      (912) 369-6000
                      merrittlaw@coastalnow.net

Reported By:             Norma Hatfield, FPR
                      Official Court Reporter
                      801 Gloucester Street, Rm. 216
                      Post Office Box 1316
                      Brunswick, Georgia 31521-1316
                      (912) 262-2608 or (912) 262-9989
                      normah3@comcast.net
                      Norma_Hatfield@gas.uscourts.gov

P R O C E E D I N G S

(Call to Order at 2:08 p.m.)

THE COURT:  Good afternoon.  Miss Nelson, call the case.

THE CLERK:  United States of America versus Stephen Keating.  Jenna Solari for the Government. Nathaniel Merritt for the Defense.

MS. SOLARI:  The Government is ready to proceed, Your Honor.

MR. MERRITT:  Ready for the Defendant, Your Honor.

THE COURT:  All right.  Back in July, July 29th, 2012, we convened court in order to sentence Mr. Keating. We adjourned in order to properly consider the restitution issue.  We had some testimony at the July hearing, and we took a recess in order to hear further evidence regarding the issue of restitution for the minors.

Ms. Solari, does the Government have any other evidence or witnesses it would like to call in that regard?

MS. SOLARI:  Your Honor, please the Court, we would like to recall Dr. Diana Walther.

THE COURT:  All right.

MS. SOLARI:  Your Honor, the Government submitted a supplemental sentencing memorandum that attached as appendices two cost breakdowns for J.J. and E.J. that were created by Dr. Walther.

1          Does Your Honor have copies of those?

2          THE COURT:  I did have the opportunity to read and

3     review that, and I have it in front of me.

4          MS. SOLARI:  Thank you, Your Honor.

5          DIANA WALTHER, GOVERNMENT'S WITNESS, SWORN

6          THE CLERK:  You may be seated.

7          Please state your full name, spell your last,

8     state your business address and occupation for the record.

9          THE WITNESS:  I'm Diana Lynn Walther,

10    W-A-L-T-H-E-R.  Business address is 1421 Lee Street,

11    Brunswick, Georgia, 31520.

12                     DIRECT EXAMINATION

13    BY MS. SOLARI:

14    Q    And your occupation, Doctor?

15    A    I'm a psychologist.

16    Q    Now I'm sure the Court recalls that you gave testimony

17    in this case on July 29th, and we'd just like to ask you to

18    provide a little bit of supplemental information regarding

19    the calculation of restitution amounts in this case.

20    A    Okay.

21    Q    We will continue to refer to the two minor victims as

22    E.J., being the youngest victim, and J.J., being the older

23    of the two victims at issue in this hearing.

24         Now you submitted updated cost estimates and breakdowns

25    as it pertains to the children's future needs.

1   A    Yes, I did.

2   Q    As I recall from your testimony on the 29th, prior to

3   that date, you said to reach your diagnoses and your

4   opinions you had evaluated both of the children; is that

5   right?

6   A    That's right.

7   Q    And you had, of course, relied upon your educational

8   and your own expertise and experience; is that right?

9   A    That's right.

10   Q    And consulted professional texts as well?

11   A    Yes, I did.

12   Q    Did you consult any additional resources to create the

13   cost breakdown that you provided to the Court for purposes

14   of today's hearing?

15   A    There was a report by a Dr. Cooper, a forensic

16   pediatrician, that I reviewed.  And I consulted with my

17   colleague, William Johnson who's also a psychologist.  And I

18   also did some research over the internet.

19   Q    Now Dr. Cooper who you mentioned, was that a forensic

20   report that Dr. Cooper prepared to help determine

21   restitution in another child exploitation case?

22   A    Yes, it was.

23   Q    Before we get into sort of the step-by-step breakdown

24   of your estimate, could I ask you to explain to the Court

25   what is not included in your restitution amount?

A     I didn't include the cost of medical treatment because I felt like, as a non-physician, that was really out of my area of expertise.

But as I understand it from the research that I've done, there is a correlation between childhood abuse and significant medical problems later in life, especially with onset in adulthood.  But it can be before that.

J.J. has already started exhibiting some medical problems.  So I'm thinking that might be an issue for her, but I did not include that in my estimate.

I also did not include the cost of tutoring if that becomes necessary.  J.J. has also been having some trouble in school as I had testified previously.  She's saying that she hates school and feels like she doesn't do very well.  So I'm thinking that may be a future need as well, but I did not include that.

I didn't include the cost of inflation.  I'm sure treatment twenty years from now is going to be a whole lot more expensive than it is currently.  But I really didn't have a way to calculate that, so that's not included.

I didn't include loss of wages if these kids, as adults, need to go into treatment and they're absent from work for a significant amount of time.  I didn't include that.

I didn't include the cost of relocation if the family

1    needs to move somewhere else in order to get the appropriate

2    services.  That would not be included in the cost.

3    Q    So then as I understand it, this breakdown really

4    sticks to the children's psychological and psychiatric needs

5    over the course of their lives?

6    A    That's correct.

7    Q    All right.  Again, before we get into the step-by-step

8    breakdown, I'd also like to ask you about the treatment

9    plan.  I shared with you the Defendant's objections to the

10   current request for restitution.

11   A    Yes.

12   Q    One of those objections is that you have not provided a

13   detailed treatment plan.

14        Could you address that issue with the Court?

15   A    I do have treatment plans.  I do treatment plans for

16   every client I see.

17        My treatment plans have goals on there that are

18   specific to symptoms and behaviors that the clients have.

19   There isn't a treatment plan that I do, or one that I know

20   of that my colleagues do, that includes a time frame.

21        So I don't have on there how long I expect it will take

22   for them to reach those goals.  I just have goals in terms

23   of the symptoms that I would like to see decrease.

24   Q    And is the purpose of a treatment plan to assess or

25   predict the costs that will be associated with treatment?

1   A     No, it's not.  It's just more a guideline for the

2   therapist and maybe also to share with the parents so that

3   the parents have an idea of where this is heading.

4   Q     So while that is of use to you in structuring your

5   counseling sessions, do you think that would be of any use

6   to the Court in determining the cost of future treatment?

7   A     I would not think so.

8   Q     All right.  Well, then, let's talk about the types of

9   treatment and the associated costs that you've submitted in

10  your estimate here.  Let's talk first about counseling.

11        I see you've indicated here counseling weekly for forty

12  years, $125 per week.  Let's talk first about that $125 per

13  week cost.  How did you arrive at that figure?

14  A     Well, I charge $120 an hour, which was actually a

15  recent increase for me.  I was charging $110.

16        There are other people in this area who I know charge

17  more than $120 an hour.  There are some people I know who

18  charge between $150 and $200 an hour.

19        So I just bumped it up a little bit to account for what

20  the cost might be in this area, and I think that's kind of a

21  low estimate, to be honest with you.

22  Q     So that's sort of maybe a low to mid estimate then for

23  hourly treatment --

24  A     Yes.

25  Q     -- in this geographical region?

1  A    Right.

2  Q    Would it perhaps be more expensive in another

3  geographical area?

4  A    I imagine if you went to, say, Atlanta or any other

5  larger city, it would be significantly more.

6  Q    But $125, you think, is fair and reasonable for this

7  area of the country?

8  A    I do.

9  Q    Now weekly for forty years, can you explain that?

10  A    I didn't mean continuously for forty years.  I was

11  thinking off and on for a total of forty years throughout

12  their lives.  We have a three year old and a six year old.

13      So I thought if we do this up to the age of seventy,

14  reasonably for how long might they need this off and on, so

15  I estimated forty years.

16  Q    The times at which these children may need counseling,

17  is that based on the things you articulated in your previous

18  testimony, certain life events that may trigger symptoms?

19  A    I think it would be more likely at those times that

20  they would need to go back to treatment.

21      But I can't predict that totally either.  It may be

22  that nothing has really happened to trigger it other than

23  for some reason they start thinking about it or

24  reexperiencing symptoms.

25      Those critical periods that I described I think would

1  be the times when I would think most likely somebody might

2  return for treatment.  Say they develop a substance abuse

3  problem, that could be anything that might trigger a

4  relapse.

5  Q    So this forty years, as you said, is meant to be sort

6  of an aggregate amount of time over the course of their

7  natural lives?

8  A    Correct.

9  Q    What type of counseling is included in this category?

10  A    I would include individual, marital or couples.  People

11  with a history of abuse are much more likely to have

12  relationship problems.  Family therapy.  It could be group

13  therapy.

14  Q    So this is all encompassing just in the area of weekly

15  therapy sessions, right?

16  A    Yes.

17  Q    Let's talk then about hospitalization.  I see here that

18  we have hospitalization estimated at $1,000 a day for a

19  total of $60,000.

20      Can you explain, first, to the Court what types of

21  things might cause one of these victims to require a

22  hospital stay?

23  A    If there were an eating disorder, suicidal thoughts,

24  self-abusive behavior like cutting themselves, substance

25  abuse, worsening depression to the point where they really

1   couldn't function and take care of themselves.

2   Q   Are those symptoms that you have seen in victims of

3   childhood sexual abuse?

4   A   Yes, they are.

5   Q   And do you believe that these particular children are

6   at significant risk for those ailments?

7   A   I do.

8   Q   How did you determine the cost, $1,000 a day, for a

9   hospital stay?

10   A   That was through consulting with Dr. Johnson and

11   looking up on the internet how much it might cost for a

12   typical hospitalization.

13   Q   Dr. Johnson is your partner in your practice?

14   A   He is.  He has been practicing for, oh my goodness,

15   forty plus years.

16   Q   Does he treat patients, also, who have been victims of

17   childhood sexual abuse?

18   A   He does.

19   Q   How did you arrive at a figure of, I guess, an

20   aggregate of about sixty days in and out of the hospital?

21   A   That was just kind of trying to take an average of what

22   it could be.  Worst case scenario would be somebody who's in

23   and out of the hospital, say, ten times for a year each

24   time, which could happen.

25       But I was just trying to take a reasonable average of

1    what this might be.

2    Q    Given the likelihood that these children will need

3    hospital care at some point?

4    A    Right.

5    Q    I did mean to ask you about that.  Your entire estimate

6    here, is this based on a worst case scenario?

7    A    No, it's not.  I tried to pick something reasonable,

8    middle of the road.  I mean, the estimate is based on the

9    risk that I think these children have of this being chronic

10    and severe, but it is not the absolute worst case scenario

11    and it's not the minimum.

12         I tried to pick something that was middle of the road,

13    in-between.

14    Q    Let's talk about, then, residential treatment.  You

15    have there as adolescents each one of these victims may

16    require residential treatment for as much as nine months at

17    $500 a day.

18         First, how did you arrive at that cost figure, $500 a

19    day, for residential treatment?

20    A    That was the internet research.  We looked up various

21    residential programs.  Of those that we could find where

22    they named a cost, we took an average of that.

23         It is not uncommon for victims of abuse to be in

24    residential treatment, usually during the teenage years, for

25    years at a time.  I mean, this could be for a few years.

1        So, again, this is not the worst case scenario.

2    Q    Nine months is actually somewhat conservative then?

3    A    I would think.

4    Q    Just to be clear, what is done in a residential

5    treatment facility, or what is the purpose of that

6    treatment?

7    A    It would be for somebody who needs longer term, more

8    structured care.  A hospital is for crisis stabilization.

9        So somebody might be in a hospital until they feel

10   like, okay, they're good enough to be released from the

11   hospital.  But then if they feel like they're not stable

12   enough to go back home, they might go into a residential

13   treatment facility or maybe a group home.

14   Q    Let's discuss the issue of medication.  Now if either

15   of these children did need medication for psychological

16   issues, who would be most likely prescribing that for them?

17   A    A child psychiatrist.  It could be a pediatrician, but

18   most of the pediatricians are not comfortable with

19   medications and diagnoses that are more complicated than,

20   say, just plain ol' ADHD or depression.

21   Q    So as a psychologist, are you entitled or are you able

22   to prescribe this type of medication?

23   A    Not in this state.

24   Q    So they would have to go see a psychiatrist then, an

25   MD/PhD?

1    A    Yes.

2    Q    So I guess we'll skip down to that bottom part where

3    you've estimated psychiatric treatment, an initial visit and

4    then every two months, for an aggregate of forty years?

5    A    Yes.

6    Q    For what purpose would those visits be?

7    A    For the psychiatric, that would be to have medication

8    management with a psychiatrist.

9    Q    All right.  Now we'll go back up to the medications.

10        How did you determine the cost both for generic and

11   non-generic, I guess, psychological medication?

12   A    We looked up on the internet the cost of various

13   medications.

14        Now some of these medications do not come in generic

15   form.  Especially medications that are new, there may not be

16   a generic form developed for four or five years.  Even of

17   those that are available in generic form, some psychiatrists

18   will say they want to prescribe brand name only because they

19   feel like it's the most effective.

20   Q    So I see, then, you've taken essentially the average,

21   $300 a month, but of course, as you've testified, it may be

22   the case that generic medications are not available for

23   these girls --

24   A    Right.

25   Q    -- depending on what they're being prescribed.

1    What type of medications were you researching to reach

2  this estimate?

3  A    Those anti-depressants.  There were also some mood

4  stabilizing drugs.

5    It could also be some of the medications that are

6  called anti-psychotics but they're not necessarily used for

7  psychosis.  They can be used for things like aggressive

8  behavior.  They're kind of mood stabilizing in nature also.

9  Things like Abilify and Seroquel.

10  Q    Is it common for victims of childhood sexual abuse to

11  ultimately need these type of medications to regulate their

12  emotions and their behavior?

13  A    Yes, it is.

14  Q    Doctor, I see when we add each of these estimates, we

15  have a recommendation of a total of $625,300 for both J.J.

16  and E.J.

17    Now as you testified earlier, these victims are about

18  three years apart in age; is that right?

19  A    Correct.

20  Q    And I believe you testified on the 29th of July, each

21  has a slightly different diagnosis.

22    Could you remind us what their diagnoses are?

23  A    E.J. has a diagnosis of anxiety disorder, NOS.  NOS

24  stands for "not otherwise specified."  It means that she has

25  symptoms of anxiety that don't fit into a particular anxiety

disorder diagnosis such as maybe obsessive-compulsive disorder.

J.J. has diagnoses of post traumatic stress disorder and major depression.

Q    In your professional opinion, will the course of treatment for these two children very closely resemble one another?

A    I would think so.  E.J. is so young that it's hard to tell what this might develop into.

For right now, I can tell that there are symptoms of anxiety.  When she's a little bit older, it may look more like post traumatic stress disorder.  It may develop into major depression.

It's just too soon to tell right now.

Q    Sure.  Doctor, in your professional opinion, is $625,300 as to each victim a reasonable amount that will fairly compensate them for their future psychiatric and psychological needs?

A    I believe it would.  I mean, worst case scenario -- we did some research on this, too.  If somebody had to stay for three years in residential treatment at $500 a day, that would cost $550,000 just for that alone.

If, as an adult, somebody had to have a year of hospitalization at $1,000 a day, that's $365,000.  Ten years of hospitalization could cost $3,650,000.

1    So I really tried to find a reasonable middle of the

2  road estimate of what these children might need.

3  Q    Okay.  And these expectations as far as what they may

4  need down the road, they're not entirely speculative,

5  correct?

6    They're based upon your interactions with the children

7  and your experience, your background, and your education

8  regarding what we tend to see in victims of this type of

9  abuse.

10 A    True.  I mean, I don't have a crystal ball.  I can't

11 tell you for sure what these kids might need in the future.

12    But based on my experience and based on the symptoms

13 and behaviors that I see so far, I'm thinking these are the

14 things that these children seem to be at risk for.

15          MS. SOLARI:  Thank you, Doctor.

16          THE COURT:  Mr. Merritt?

17          MR. MERRITT:  Thank you, Your Honor.

18                    CROSS EXAMINATION

19 BY MR. MERRITT:

20 Q    Good afternoon, Dr. Walther.

21 A    Good afternoon.

22 Q    The initial contact you had with these children, was

23 that arranged through the Government or was it arranged

24 through the parents of the children?

25 A    I believe I first spoke with, I guess, the attorney.

Yes.  And then the mom made an appointment.

THE COURT:  When you say "the attorney," do you mean Ms. Solari?

THE WITNESS:  Yes.  I can't remember if I spoke with her personally or whether that was an assistant that I spoke with.  That's why I kind of hesitated on that.

BY MR. MERRITT:

Q    So someone from her office or Ms. Solari herself contacted you regarding these children?

A    Correct, who asked if I was willing to do an assessment on them.

Q    Did you bill the Government for that assessment, or did you bill the parents?

A    I don't do the billing.  My office manager does.  But I believe we billed the Government.

Q    The first estimate that you provided at the previous hearing indicated that there was some billing done to the Government.

A    I would not disagree with that.  Like I said, I don't do the billing personally.  My office manager does.  But I believe that's the arrangement that they had.

Q    All right.  Was there a request made by you to assess these children for purposes of appearing in court and testifying as a witness?

A    I was asked to do an assessment and prepare a report.

1    I didn't know for sure whether I would be testifying in
2    court or not.
3    Q    Your cohort, Dr. Johnson, that you conferred with in
4    preparing your opinion today, has he ever interviewed or
5    assessed these children in any manner?
6    A    No, he has not.
7    Q    And Dr. Cooper, you indicated you had consulted with a
8    report that he had prepared.
9    A    I read a report that she had written.
10   Q    She.  I'm sorry.
11        Is she a local psychologist?
12   A    I don't believe so.  Maybe Savannah.  I'm not sure.  I
13   don't remember.
14   Q    Have you ever met Dr. Cooper?
15   A    No, I have not.
16   Q    Has Dr. Cooper ever seen or assessed these children in
17   any manner?
18   A    No, she has not that I know of.
19   Q    I understand your projections here are estimates.
20   Please understand I'm not trying to be critical of your
21   opinion or those estimates.
22   A    I understand.
23   Q    But there currently has not been any hospitalization of
24   the children; is that correct?
25   A    That's correct, but I wouldn't expect that at the ages

1    of three and six.

2    Q    At what age would you expect that?

3    A    I think if it were going to happen it would be more

4    likely to happen during the teenage years, but not

5    necessarily.  There are children who are ten years old or

6    younger who are in hospitals.

7    Q    But these children are not, and it's not expected in

8    the immediate future?

9    A    I wouldn't expect it.  I'm not sure what you mean by

10   "immediate," but I wouldn't expect, say, within the next

11   year.  No.

12   Q    The same is true for residential treatment.  There's

13   been none in the past, and you wouldn't anticipate any for

14   the next twelve months?

15   A    No, I don't think so.  That would be more likely when

16   they're adolescents.

17   Q    Neither of the children, to your knowledge, are on any

18   type of medication?

19   A    That's true.

20   Q    Again, nobody knows when that will occur?

21   A    Due to their age, I wouldn't expect it to occur very

22   soon, but there are children who are six years old who are

23   on medication.

24       So I can't say that could not occur for J.J., let's

25   say, within the next twelve months.  It's possible.

1    Q    Okay.  And again, if medications are required, it would

2    have to be prescribed by a medical doctor or someone with

3    the authority to write a prescription such as a psychiatrist

4    or pediatrician?

5    A    Correct.

6    Q    Neither children are currently being treated by a

7    psychiatrist?

8    A    Correct.

9    Q    And they never have been?

10   A    To my knowledge, no.

11   Q    Were the children treated by any form of psychologist

12   or counseling prior to being assessed by you?

13   A    Yes, they were.  J.J. had seen a counselor, and I

14   believe E.J. had either briefly seen one or her mother had

15   spoken to one at that time.  But it was very brief for E.J.

16   Q    Okay.  And, Doctor, so that I understand clearly, the

17   forty years of counseling that you have estimated, does it

18   involve necessarily forty years from today's date through

19   the next consecutive forty years?  It's an estimate of a

20   total of forty years over each child's life-span; is that

21   correct?

22   A    Correct, because they could be in therapy for, say, two

23   to five years, out of it for a while, and back in it.  It's

24   really hard to predict that.  I mean, they could be out for

25   ten years and then have some kind of episode during, say,

1   their thirties and be in it for twenty-five years.

2   Q    Doctor, because of these variables and unknowns is

3   there a margin of error in the estimate that you have given?

4   A    Of course there is, but that's my best estimate.  And

5   that's what I was asked to produce.

6   Q    Can you give us a percentage of that margin of error?

7   I know you said this is the middle of the road.  It's not

8   the worst case scenario, and it's certainly not the best.

9        Is there -- you know, is it 5 percent?

10  A    I don't think I can calculate that, honestly.

11            MR. MERRITT:  Okay.  Thank you.

12            THE COURT:  Ms. Solari, any redirect?

13            MS. SOLARI:  No, ma'am, Your Honor.

14            THE COURT:  You may step down.

15            THE WITNESS:    Thank you.

16            THE COURT:  All right, Ms. Solari, anything else

17  from the Government regarding the amount of restitution?

18            MS. SOLARI:  No, Your Honor.

19            May the witness be excused?

20            THE COURT:  Any objection?

21            MR. MERRITT:  No, Your Honor.

22            THE COURT:  Yes, she may.

23            MS. SOLARI:  That's all the evidence we have on

24  the issue of restitution, Your Honor.

25            THE COURT:  Mr. Merritt, let me hear from you.

1  Any witness, or evidence, or argument you would like to make

2  on the restitution issue?

3          MR. MERRITT:  No, Your Honor.  We don't desire to

4  present any evidence, and we presented argument at the prior

5  hearing, Your Honor.  I don't want to rehash that issue.

6          THE COURT:  The written objections that you filed

7  went to two issues:  The first being the objection to the

8  proposed restitution amount for L. and J., the adult

9  victims, and you withdrew that objection at the last

10  hearing.  And the remaining objection was to the future

11  restitution amounts for J.J. and E.J., the two minor

12  victims; is that correct, Mr. Merritt?

13          MR. MERRITT:  Yes, Your Honor.

14          THE COURT:  Any argument you would like to make

15  about that one remaining restitution objection regarding

16  future restitution for J.J. and E.J.?

17          MR. MERRITT:  Just briefly, Your Honor.

18          THE COURT:  Yes.

19          MR. MERRITT:  So that the Court understands, as I

20  stated before, we are not here opposing restitution.

21  Clearly this is a case where it is warranted, and we

22  anticipate the Court awarding that.

23          It was the manner in which it was presented at the

24  prior hearing that we objected to primarily.  And some

25  clarification has been made here regarding Dr. Walther's

1   opinion.

2           My concern would be that the manner approving that

3   follow more the *Lundquist* case which we cited to Your Honor

4   in our sentencing memo, I believe the first sentencing memo,

5   regarding calculation.  And that was a case where maybe

6   there was more specific reports provided to the Court, but

7   there were three separate assessments in that case that were

8   provided.  I know why the assessments are not necessarily a

9   concern of the Court because the Court is not involved in

10  the counseling.  The Court is concerned about the

11  restitution.

12          But as I understand in the *Lundquist* case, the

13  assessments followed a very specific plan for what the

14  treatment would be.  It was not necessarily as speculative

15  about medications, or psychiatric treatment, or

16  hospitalizations which are not ongoing and are not

17  anticipated in the immediate future.

18          That was simply my concern in trying to get the

19  Court to order an amount which would be in line with what

20  the Government's burden of proving is, by a preponderance of

21  the evidence.

22          The other thing that I was concerned about was the

23  forty years.  That has been clarified.  I understand

24  Dr. Walther, now she's saying that over the course of their

25  lifetime, probably an aggregate of forty years, not

necessarily forty calendar years from today's date because
it was a little bit confusing about how we had children of
differing ages and differing diagnoses as far as the
psychological diagnosis was concerned and the restitution
amounts were the same.

This is a very difficult job for Your Honor, I
know, to order an amount.  I'm not about to suggest one.  I
cannot sit here and say that the Government's request is
unreasonable.  It's not unreasonable because there's so many
variables that go into place.  It's a difficult assessment.

I assume I will close by saying we're not really
objecting to restitution, as I said, but we're not objecting
to the method as much as we were.  We just want it to be in
line with --

THE COURT:  As I understand your efforts, you have
already succeeded in some respect in that you wanted to make
sure that the Government is put to its burden of putting
forth a reasonable estimate of future --

MR. MERRITT:  That's correct.  That's correct,
Your Honor.

THE COURT:  -- losses.

MR. MERRITT:  That's correct.  We will close with
that.

THE COURT:  Thank you, Mr. Merritt.

Ms. Solari, let me hear argument.

1          MS. SOLARI:  Yes, Your Honor.

2          Your Honor, this is, of course, an inexact

3   science.  And fortunately, absolute precision is not

4   required to determine a restitution amount under

5   circumstances such as these.  And thank goodness it's not

6   because, admittedly, we cannot do this with absolute

7   precision.  We don't have a crystal ball, and Dr. Walther

8   can't see into the future as well as we might wish she

9   could.

10          However, she has extensive experience in this

11   area.  She has a specialty in treating adolescents who have

12   been victims of childhood sexual abuse.  So based on her own

13   firsthand experience, she has told us both in the initial

14   sentencing hearing and today what we can expect with

15   reasonable certainty we will see in the future with these

16   two victims of the Defendant's abuse.

17          These children are at significant risk of suicidal

18   behavior, self-injury, substance abuse, trouble in school,

19   and any number of another things that are going to,

20   unfortunately, probably require at some point

21   hospitalization, long-term residential treatment, individual

22   and group therapy.

23          Initially, Your Honor, and admittedly we had a

24   much more general estimate of what we thought that would

25   cost.  And I think it's fair that the Defendant challenged

us and put the Government to its proof to be more specific,

to ground each one of these numbers and each one of these

time estimates in something more tangible.

I think we've done that to the extent that we can

with Dr. Walther's very careful and considered diagnosis of

each one of these children.  She has consulted with another

expert in her office.  I did provide her with a report

submitted in a similar case when she said, "I'm not sure

what this is supposed to look like or what information the

Court needs."  So I asked her to consult that as well.

She's read learned treatises.  She has looked

on-line to determine what things cost.  I think with a great

degree of fairness, she has gone out of her way to make sure

we're not asking for the world simply because there's a

chance we might get it.  These are averages.

She is trying to be as fair as she can and say,

"You know, in a lot of cases this would cost a lot more.

And I could anticipate these children's situations would be

a lot worst, but we'll go with the middle of the road

estimate," because she believes in her own professional

opinion that that is reasonable and fair to compensate these

children for their future losses.

Of course, that's what the Government wants.  I

understand Defense counsel is agreeing that that's what's

needed in this case.  And I know, of course, that's the

1    Court's concern, just to make sure the victims are fairly

2    compensated.

3            I wish, Your Honor, that there were some more

4    precision with which we could predict the future.  We've

5    done the best we can.  And I do think these are fair

6    estimates of what these children will need, again, based on

7    their diagnoses and the behaviors, especially with regard to

8    J.J. that Dr. Walther has already seen and unfortunately the

9    Court witnessed firsthand in the sentencing hearing.  This

10   is damage that will take perhaps forever to be undone.

11           So this is the best we can do for these children

12   in this case, Your Honor.  I wish we had more, but I think

13   this is a reasonable amount of restitution for these

14   victims.

15           THE COURT:  Thank you, Ms. Solari.

16           THE COURT:  Mr. Keating, is there anything that

17   you would like to say to the Court before I decide the issue

18   of restitution?

19           THE DEFENDANT:  No, ma'am, just that I'm sorry for

20   all the pain that I have caused everybody.

21           THE COURT:  All right.  Mr. Merritt and Mr.

22   Keating, if you will approach.

23           To continue the restitution portion of the

24   sentencing procedure, I find that the evidence presented

25   here today regarding restitution for the minor victims, J.J.

and E.J., as it relates to their future losses, that evidence in the form of Dr. Walther's testimony is detailed and credible and conservative, and in the absence of a crystal ball, is a very reasonable basis upon which the Court can properly conclude a restitution amount for what is, by definition, an inexact science.

I find that the Government has carried its burden of establishing by a preponderance of the evidence the restitution amount for these minor victims for their future losses.

As stated before, the only issue of restitution that remains disputed by the Defendant was these future losses for those minor children. As Defense counsel has explained, they do not contest that some restitution is due, but merely were doing their job in demanding that the Government come forth with the appropriate level of proof. And the Government has done so.

I find that the credible evidence establishes by a preponderance that restitution for the future loss for the minor victim J.J. should be awarded in the amount of $625,300. And likewise, the same future loss restitution amount for the minor E.J., $625,300.

When those future loss amounts are added to the undisputed and previously established restitution amounts, that comes to a total restitution for all victims of

1    $1,284,363.94.

2             Of course, the economic circumstances of the

3    Defendant do not allow for the payment of the full amount of

4    restitution ordered under any reasonable schedule of

5    payments now or in the foreseeable future.  Therefore, a

6    plan is in order.  While in the custody of the Bureau of

7    Prisons, the Defendant is ordered to pay a minimum of 80

8    percent of any payment received from any retirement account,

9    or employee pension, or Social Security benefits toward this

10   restitution obligation.

11            Additionally, pursuant to 18 USC § 3664(f)(3)(B),

12   nominal payments of either quarterly installments of a

13   minimum of $25 if working non-UNICOR or a minimum of 50

14   percent of monthly earnings if working UNICOR shall be made.

15            Upon release from imprisonment, while on

16   supervised release, nominal payments of a minimum of $500

17   per month shall be made.

18            All such payments should be made payable to the

19   Clerk of the U. S. District Court for ultimate distribution

20   on to the identifiable victims.

21            And to be clear, the total amount for the minor

22   victim J.J., including future and all other losses, is a

23   total of $634,885.40.  As to the minor victim E.J.,

24   $634,220.40.  As to Jessica Johns, $1,138.65, and as to Lisa

25   Keating, $14,461.49.

1    I do order that the portion of this judgment which

2    identifies the victims, that that be filed as an addendum to

3    the judgment and that that addendum be sealed for the

4    limited purpose of protecting the identities of the minor

5    victims.

6    I have determined that the Defendant does not have

7    the ability to pay interest, and it is ordered that the

8    interest requirement be waived.

9    Before we conclude the sentencing for Mr. Keating,

10   and before I sign the J & C and remand him to the custody of

11   the U. S. Marshal, are there any other issues that need to

12   be made, or any objections that need to be raised, as to any

13   part of the sentencing, including the amount of the

14   sentencing, the length, my findings of fact, my conclusions

15   of law, or to the manner in which sentence was pronounced.

16   Mr. Merritt?

17   MR. MERRITT:  No objection, Your Honor, but a

18   question because of some peculiar circumstances in this

19   case.  Mr. Keating does have a 401(k) plan and a defined

20   benefit plan.  He, of course, is not eligible for any

21   receipts from the defined benefit plan at the present time.

22   We previously consented to the entry of an order

23   which prohibited him from disbursing any of those funds.

24   We're also involved in a divorce with his wife.

25   Given that Your Honor has entered the order for

restitution and the payment plan, is my understanding

correct that that restraining order will now be lifted, and

if any of those proceeds are disbursed, then the 80 percent

will be paid to the Clerk to pay the restitution?

THE COURT:  Ms. Solari?

MS. SOLARI:  Your Honor, I had intended to ask the

same question.  I apologize for not being more familiar with

the financial aspects or the collection aspects.

It was the Government's intention to take action

against Mr. Keating's 401(k) account, which as of May 14th

of this year held just slightly over $198,000.

We also wanted to ask the Court whether there

needs to be anything done at the appropriate time to compel

Mr. Keating to take action to begin receiving payments from

his defined benefits plan for which he will be eligible.  I

believe in a few years, he would receive a lesser payment

than he would if he waited until the year 2025, when he

would receive double the amount if he waited until that

time.

The Government is interested in collecting as much

as possible as soon as possible for these victims, and we're

just wondering the most appropriate way to go about that.

THE COURT:  I would not be surprised if that were

not your intention as well on behalf of the Defense.

MR. MERRITT:  It is, Your Honor.  I think the

1   Court's ruling is quite fair to both sides.  It takes 80

2   percent of that money that is available now, which does

3   leave some to satisfy something in the divorce as well as

4   there are certain other unpaid costs that we have incurred

5   in this case.  If the Court --

6         THE COURT:  And certain day-to-day living -- not

7   requirements, but close to it --

8         MR. MERRITT:  Yes, ma'am.

9         THE COURT:  -- in prison life.

10        THE COURT:  Let me propose this.  If counsel for

11  the Government and counsel for the Defendant will meet and

12  confer this afternoon, I think you can probably come up with

13  an agreed-upon order and present it to me.  We can make that

14  appropriate as for the collection aspect.

15        MS. SOLARI:  Thank you, Your Honor.

16        MR. MERRITT:  Yes, Your Honor.

17        THE COURT:  Any objections as to any part of this

18  sentencing or from the July 29 portion?

19        MR. MERRITT:  None from the Defense, Your Honor.

20        MS. SOLARI:  None from the Government, Your Honor.

21        THE COURT:  All right.  Mr. Keating, I will remand

22  you to the custody of the U. S. Marshal.  We will be in

23  recess.  If you will present me any order regarding the

24  mechanics of the collection, we will address that.

25        MR. MERRITT:  Thank you, Your Honor.

1    THE COURT:  Thank you, counsel.

2         (Recess at 2:51 p.m.)

3

4

5

6

7

8

9                    CERTIFICATION

10

11         I certify that the foregoing is a true and correct

12  transcript of the stenographic record of the above-mentioned

13  matter.

14

15  *Norma Hatfield*

16

17  _____        September 23, 2014

    Norma Hatfield, FPR, Court Reporter
18

19

20

21

22

23

24

25