UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION


UNITED STATES OF AMERICA,        :        Case No. CR212-22
                                 :                   CR212-23
         Plaintiff,              :
                                 :
vs.                              :
                                 :
STEPHEN A. KEATING,              :        Brunswick, Georgia
                                 :        July 29, 2013
         Defendant.              :        1:04 p.m.
_____  :


SENTENCING HEARING
BEFORE THE HONORABLE LISA GODBEY WOOD
United States Chief District Judge


APPEARANCES:

For the Government:      JENNIFER G. SOLARI
                        Assistant United States Attorney
                        22 Barnard Street, Suite 300
                        Post Office Box 8970
                        Savannah, Georgia 31412
                        (912) 652-4422
                        Jenna.Solari@usdoj.gov


For the Defendant:      NATHANIEL MERRITT, ESQUIRE
                        Merritt & Grinstead
                        Post Office Box 1610
                        Hinesville, Georgia 31313-8610
                        (912) 369-6000
                        merrittlaw@coastalnow.net


Reported By:            Norma Hatfield, FPR
                        Official Court Reporter
                        801 Gloucester Street, Rm. 216
                        Post Office Box 1316
                        Brunswick, Georgia 31521-1316
                        (912) 262-2608 or (912) 262-9989
                        normah3@comcast.net
                        Norma_Hatfield@gas.uscourts.gov

<u>I N D E X</u>

<u>Restitution</u>:

Basis: Ms. Solari          7

      <u>Witnesses</u>                    <u>Direct</u>        <u>Cross</u>

      Diana Walther                  13          37

      Peter Amodeo                   45

  Argument:  Mr. Merritts 55
           Ms. Solari   57

  Finding by the Court     60


<u>Sentencing</u>:

  Mitigation Argument:  Mr. Merritt     63
                 Ms. Solari      64

  Defendant's Statement    70

  Sentence by the Court    71


<u>EXHIBITS</u>:                                    <u>Page</u>

Govt. Ex. No. 1 (Videotape)                  48

Govt. Ex. No. 2 (Keating Restitution Chart)  60

P R O C E E D I N G S

(Call to Order at 1:04 p.m.)

THE COURT:  Good afternoon.  Miss Nelson, call the first case.

THE CLERK:  United States of America versus Stephen Keating.  Jennifer Solari for the Government. Nathaniel Merritt for the Defense.

MS. SOLARI:  The Government is ready to proceed, Your Honor.

MR. MERRITT:  Ready on behalf of the Defendant, Your Honor.

THE COURT:  Mr. Merritt, approach with your client, Stephen Keating.

Mr. Keating, you appeared before me on February 5th, 2013, accompanied by your attorney, Mr. Merritt, for your Rule 11 proceeding.  And pursuant to a plea agreement, you pled guilty and you were adjudged guilty of Counts Eight, Thirteen, and Fourteen of the Indictment charging you with sexual exploitation of a minor, in violation of 18 USC § 2251(a).  And you pled guilty to Count Fifteen, charging you with distribution of child pornography in violation of 18 USC § 2252A(a)(1).

Now at the end of that Rule 11 proceeding and my acceptance of your plea of guilty, I directed the probation officer to prepare a Presentence Report and to disclose that

report to the Defense and to the Government.

Mr. Keating, have you had the opportunity to read and review that report and go over it with your attorney?

THE DEFENDANT:  Yes, ma'am, I have.

THE COURT:  Are there any objections as to the factual statements contained in that report or to the probation officer's application of the advisory sentencing guidelines?

THE DEFENDANT:  No, ma'am.

THE COURT:  Mr. Merritt, is that correct?

MR. MERRITT:  That's correct.

THE COURT:  No objections?

MR. MERRITT:  No objections.

THE COURT:  Ms. Solari?

MS. SOLARI:  Your Honor, the Government has no objections, but we'd like to note that Officer Riggs very astutely noted in the restitution chart that we submitted, that is appended to the Presentence Report, we made some mathematical errors.  Those have been corrected, and a new copy has been submitted to the Clerk of Court.

THE COURT:  Let me state for the record that as a part of the addendum to the Presentence Report, it was originally noted that the Defendant reserved the right to object to the restitution calculation set forth in the Presentence Report.

1    Thereafter, I did receive and review the

2 Defendant's sentencing memorandum regarding restitution

3 calculation.

4    It is my understanding that upon receipt of that

5 memorandum, the Government has altered somewhat its position

6 regarding restitution; is that correct?

7    MS. SOLARI:  Your Honor, not our position

8 regarding restitution.  We have clarified those mathematical

9 errors.

10    But it is still the Government's position that the

11 two adult victims listed in the chart are victims pursuant

12 to the statute and are entitled to restitution in the

13 amounts claimed in the updated chart.

14    THE COURT:  Mr. Merritt, is that now your

15 concession as well?

16    MR. MERRITT:  It is, Your Honor.  My client, just

17 a moment ago, agreed to withdraw any objection to them being

18 declared victims.

19    THE COURT:  All right.  And Mr. Keating, just to

20 be clear, as it presently stands, the Presentence Report

21 identifies and sets forth various bases for four victims to

22 receive restitution:  two minors, J.J. and E.J.; and then an

23 adult victim, Jessica Johns, and another adult victim, Lisa

24 Keating.

25    Now is it your position here at sentencing that

1  you do not object to those four individuals being deemed

2  victims?

3        THE DEFENDANT:  That's correct, Your Honor, no

4  objection.

5        MR. MERRITT:  Your Honor, if I may, and for

6  clarification purposes, while we have never been opposed to

7  restitution, the sentencing memo that we filed simply sought

8  to address the manner in which it was calculated.  The

9  information that was provided to us from Dr. Walther did not

10 have a lifetime recommendation or calculation in the

11 information which we received from her, which is why we

12 filed the sentencing memo.

13       THE COURT:  Again, just to be clear, originally

14 you contested two issues in your sentencing memorandum, both

15 the designation of the two adults as victims, which you and

16 your client have now withdrawn.

17       MR. MERRITT:  That's correct.

18       THE COURT:  And second, the amount of calculation

19 as it relates to the future calculations up to the age of

20 seventy for the two minors; is that correct?

21       MR. MERRITT:  That's correct, Your Honor.

22       THE COURT:  All right.  You two have a seat, and

23 let me proceed with Ms. Solari to set forth the basis for

24 the restitution order.

25       If you will walk me through what the amounts are

1    and make your record regarding the preponderance of the

2    evidence that those amounts are appropriate and the

3    proximate cause.

4         MS. SOLARI:  Yes, ma'am, Your Honor.  As to J.J.,

5    that is a direct minor victim of the Defendant's conduct in

6    this case, to which he has pled -- and I believe it's Count

7    Fourteen of the Indictment if I remember correctly -- these

8    costs represent -- the costs that have already been incurred

9    are costs that were borne initially when J.J. was taken to

10   the Cord of Three for counseling following the revelation of

11   the abuse.

12        Ultimately, after some discussion with the

13   Government, family members took J.J. to be assessed by

14   Dr. Walther whom the Court will hear from today.  Those are

15   the costs that have already been incurred as to J.J. and

16   E.J.

17        Future costs, again, Dr. Walther will address

18   those to the Court as to the life expectancy of each child

19   and the need for continued counseling.  That is reflected in

20   the estimate of the future costs, both counseling with Dr.

21   Walther and the mileage to and from her office given where

22   the victims are currently residing.  That's for J.J. and

23   E.J.

24        Again, this is counseling that speaks directly to

25   the effects that these children have suffered at the hands

1    of the Defendant and his prolonged abuse.

2            As to Jessica Johns, Jessica Johns, Your Honor, is

3    the mother of J.J. and E.J. in this case.  She went for her

4    own personal counseling at the Cord of Three, when she first

5    learned of the Defendant's conduct with her children, for

6    the number of visits reflected in the chart.  That was to

7    help her cope with the shock, and the grief, and the anger

8    that she felt upon learning of this behavior, and also to

9    help her with some coping skills with the children and

10   learning how to interact with them and how to understand and

11   process some of the statements they were making and some of

12   the questions they were asking.

13           Her mileage to those visits is reflected in the

14   chart.  Her mileage to Dr. Walther, Your Honor, reflects the

15   visits for the children.  She was bringing them to

16   Dr. Walther in Brunswick from their home, which I believe is

17   in Jesup.

18           For Lisa Keating, Your Honor, she has a number of

19   claims.  The lost wages that are claimed in the charts are

20   those for missed days of work.  I believe Lisa Keating was

21   able to take leave, but now she has been debited those leave

22   hours from her account and can no longer avail herself of

23   those.

24           Those leave days were not for any sort of personal

25   recreation.  Those were days in which either she had to

attend court proceedings, had to bring the children for counseling, or for some other portion of the investigation, or was so physically or emotionally ill that she simply could not get through the day to go to work.

You see the mileage to and from the counseling center in Waycross.  Mrs. Lisa Keating has already incurred expenses for her own personal counseling for her emotional issues that she suffered as a result of learning of this conduct.

Lisa Keating is the estranged wife of the Defendant.  They are currently engaged in divorce proceedings which Mrs. Keating began immediately upon learning of this conduct, and she has continued to help law enforcement throughout the investigation.  It has taken a significant toll on her, Your Honor, mentally, emotionally, and I can tell you from having seen her over the course of time, physically.

She is a slight woman to begin with, and she has lost probably close to thirty pounds.  She has trouble keeping down food.  She has developed a number of physical ailments.  She has a skin condition that has reemerged due to the stress involved with this situation.  She is suffering now from depression and has to take antidepressant medication just to get through the days.

So, again, her mileage to and from her own

counseling sessions is reflected here as well as her medical

expenses in Brunswick.  We have Dr. Blumer.  We have

Dr. Cabeca.  I believe those are the two medical visits.

Again, those are for issues of depression and digestive

disorders that she has developed as a result of the stress

she has incurred throughout this case.

Mileage to and from the Hinesville Justice Center

and the Liberty County Jail, obviously, those were incurred

during her participation in this case and this investigation

in assisting the Government.

Mrs. Keating has been to and continues to go to

counseling at a place called the Cord of Three, which I

believe is a Christian based counseling center.  She says

she has found some relief there, but continues to struggle

with the daily stress of this case and all of the fallout.

The victims in this case, by the way, Your Honor,

are Mrs. Keating's grandchildren.  She said that it would be

of benefit to her to continue counseling for the period of

one year.  She would very much like to do that because she

says she's still not entirely able to cope on her own with

the emotional and the physical fallout from these events,

but does find, again, some comfort in attending these

counseling sessions.

The mileage to and from those sessions is

reflected here, Your Honor.  And that is for Lisa Keating

1   personally and, again, only for a period of one year in the

2   future.

3         The three items listed at the end of this chart --

4   the Sony camera, the Dell laptop, and the Acer notebook --

5   are items that were seized during the execution of a search

6   warrant at the Defendant and Mrs. Keating's home in November

7   of 2012, I believe it was. These are items that were taken

8   based on probable cause they contained contraband,

9   specifically child pornography.

10         The Sony camera was used to create some of the

11   images at issues in this case. I'm sorry, I can't remember

12   with specificity exactly what was found on the Dell laptop

13   and the Acer notebook. But the fact of the matter is, Your

14   Honor, these have been taken into evidence and tagged as

15   such. These were Mrs. Keating's personal property.

16         It would be more traumatic than helpful for her to

17   have them back at this point, even if she could claim them

18   in an ancillary forfeiture proceeding. So because she has

19   laid out some expense for these items, and they are of

20   significant value, she has submitted a request for

21   restitution for those as well.

22         THE COURT: All right. Do you propose to go

23   forward with your witnesses at this point on the restitution

24   amount?

25         MS. SOLARI: Your Honor, yes. The Government

1    intends to call Dr. Diana Walther to tell the Court about

2    the need for further counseling for the children.  We had

3    initially planned to call Jessica Johns and Lisa Keating as

4    well.  However, based on the Defendant's withdrawal of that

5    objection, unless the Court would like to hear something

6    more as to their expenses, we would just rely on the

7    testimony of Dr. Walther.

8              THE COURT:  Mr. Merritt?

9              MR. MERRITT:  Your Honor, on behalf of the

10   Defendant -- pardon me for interrupting -- I think we can

11   stipulate that the amounts that are claimed are sufficient

12   and agree, as a part of the stipulation, that if the

13   Government called these witnesses, they could prove by a

14   preponderance of the evidence those amounts.

15             THE COURT:  That is including the future loss

16   amount that is calculated for one year?

17             MR. MERRITT:  Yes, Your Honor.

18             THE COURT:  All right.  Is that correct, Mr.

19   Keating?  Do you so stipulate?

20             THE DEFENDANT:  Yes, Your Honor.

21             THE COURT:  All right.  With that then, I think

22   your proof is complete there being no objection from the

23   Defense regarding the amounts of restitution and their

24   status as victims for Ms. Jessica Jones and Mrs. Lisa

25   Keating.

1          So if you will proceed then to your proof

2    regarding the two minor victims at issue.

3          MS. SOLARI:  Thank you, Your Honor.  The

4    Government calls Dr. Diana Walther.

5          THE CLERK:  Please raise your right hand to be

6    sworn.

7          DR. DIANA WALTHER, GOVERNMENT'S WITNESS, SWORN

8          THE CLERK:  You may be seated.

9          Please state your full name, spell your last,

10   state your business address and occupation for the record.

11         THE WITNESS:  I am Diana Lynn Walther.  It's

12   W-A-L-T-H-E-R.  And my business address is 1421 Lee Street,

13   Brunswick, Georgia, 31520.  I am a licensed clinical

14   psychologist.

15                     DIRECT EXAMINATION

16   BY MS. SOLARI:

17   Q    Thank you.  I'd like to talk to you just a moment about

18   your education and your professional background.

19         But before I do, I just want to say, both for my own

20   benefit and yours, recap something we talked about earlier.

21   I understand you've met two of the minor victims in this

22   case.

23   A    Yes, I have.

24   Q    And provided them some treatment?

25   A    Yes, I have.

Q    We're trying, as best we possibly can, not to mention

their names on the record for any reason since they are

minors.

A    Okay.

Q    So we'll refer to them, perhaps, as "J.J." and "E.J.,"

or perhaps the "older girl" or the "younger girl," to

distinguish them as best we can.

A    Okay.

Q    Could you tell the Court a little about your

educational background?

        THE COURT:  And just to be clear, E.J. is the

younger girl, and J.J. is the older girl?

        MS. SOLARI:  That's right, Your Honor.

BY MS. SOLARI:

Q    Please tell the Court a little bit about your

education.

A    Okay.  I have a Ph.D. in clinical psychology.  I got it

from the University of South Carolina.  I've done an

internship in Queens, New York.

    I have had various employment experiences.  I don't

know how much of that you want me to go into.  I was

clinical faculty at Medical University of South Carolina in

Charleston where I supervised psychiatry residents.

    I have been a child and youth program coordinator at a

large mental health center in Albemarle, North Carolina.  I

have worked at another mental health center.  I have worked
at St. Simons by the Sea on the island here back when it was
Charter By the Sea.

I've been in private practice for about twelve years
now.

Q    Could you speak to the Court about any specific
experience you've had in evaluating, assessing, or treating
minor victims of sexual abuse?

A    I have, throughout the years, made it a point to
receive training in that area.  I have been to, oh, I
don't know how many workshops focusing on the assessment and
treatment of childhood victims of sexual abuse, both
treating the children and treating the adults who were
victims as children.

I receive many referrals from DFACS, so I work with a
number of clients who have been victims of abuse.
Therefore, when I have the opportunity to go to a workshop,
I often go to a workshop that focuses on sexual abuse.

I've also received supervision on sexual abuse issues
throughout graduate school.

Q    Did you act as a supervisor, I believe you said, when
you worked at the Medical University of South Carolina as
part of the Department of Psychiatry and Behavioral
Sciences?

A    I did.  I supervised psychiatry residents.

1  Q    And were they at that time assessing or treating any

2  child patients?

3  A    Often they were.

4  Q    For what types of issues?

5  A    All of them:  PTSD, post traumatic stress disorder,

6  depression, anxiety disorders, eating disorders.  We had a

7  lot of inpatient admissions with clients who had a history

8  of sexual abuse.

9  Q    Are you able to quantify what portion of your current

10 practice deals with folks who are suffering from issues as a

11 result of having been sexually abused, if you could

12 approximate?

13 A    That's tough.  I would say 50 to 75 percent.  A lot of

14 times, that's not the initial presenting problem, but as I

15 get to know the client, eventually over the course of

16 therapy, they say, "Oh, this happened to me when I was a

17 child."

18      That's fairly common for that to happen.

19 Q    What types of clinical diagnoses do you often apply or

20 do you see in people who have been victims of childhood

21 sexual abuse?

22 A    Probably the most common would be the PTSD, post

23 traumatic stress disorder, or major depression.

24      But then you can also have things like anxiety

25 disorder, obsessive compulsive disorder, dissociative

1    disorder, substance abuse, eating disorders.

2    Q    Are you familiar with how to recognize and treat each

3    one of those disorders?

4    A    Yes, I would be.

5         MS. SOLARI:  Your Honor, at this time, the

6    Government would offer Dr. Walther as an expert in clinical

7    psychology with a specialization in children and

8    adolescents.

9         THE COURT:  Mr. Merritt, any objection or

10   requested voir dire?

11        MR. MERRITT:  No objection or voir dire, Your

12   Honor.

13        THE COURT:  Ms. Solari, your motion is granted,

14   and Ms. Walther is deemed an expert in that field.

15        MS. SOLARI:  Thank you.

16   BY MS. SOLARI:

17   Q    Dr. Walther, I'd like you to tell the Court a little

18   bit about -- and I know this sounds like a broad question,

19   but I'd like to focus it, as you know, to this particular

20   case.

21        What sort of learning and developmental stages are

22   children in when they're, say, one or two years old with

23   regard to their self-concepts, ability to interact with

24   other people?

25   A    According to a developmental psychologist named Piaget,

from ages one to two, they would be in what's called a
sensory motor stage. During that stage, they are forming
lifelong representations of the world. These are called
schematas.

It's a way of organizing information, organizing how
you view yourself and other people that, according to
Piaget, stick with you for the rest of your life.

According to another developmental psychologist named
Erikson, a child from the ages of one to two would be, first
of all, the stage of trust versus mistrust, which is birth
to about eighteen months. And then they would be in the
stage of autonomy versus shame and doubt, which would be in
approximately the ages of two to three.

Q    So those seem like diacotomous choices. In other
words, does a child sort of go one way or the other, trust
versus mistrust?

A    Yes. You either reach the successful part of that
stage, or you don't.

If you don't reach it, according to Erikson, you never
will. If you don't acquire that virtue, you won't ever have
it. You can go on to other stages, but you will be stuck
with, say, mistrust or stuck with shame and doubt for the
rest of your life.

Q    What types of influences, then, may dictate whether a
child has trust versus mistrust?

A    Mainly the parents, but it could be any caregivers

early on.  The main information that a child receives about

the world would be from whoever is taking care of him or

her.

Q    What similar developmental stages, then, are children

going through when they're, say, between the ages of three

and six?

A    Three and six, according to Piaget, would be a pre-

operational stage.  During that stage, their thinking is

very egocentric.  Everything revolves around them.

That means if anything good happens, they would

attribute that to themselves.  If anything bad happens, they

would blame themselves.  They would attribute all that to

them.

It's also a time where a child's thinking would be very

rigid, irreversible.  Once they form a thought, it's hard to

go back and get them to think otherwise.

It's also a stage where you have the development of

further thinking in terms of representations of the world.

In the sensory motor stage, from ages one to two, you

develop what's called "object permanence," where you realize

that once an object or a person, like your mom, is there

that they're not going to, all of a sudden, disappear if

they walk out of the room.  They still exist.

In the pre-operational stage, you're reasoning

abilities get even beyond that. You're realizing that people still exist even if you don't see them, even more and more. So you're thinking more about the people who take care of you and able to reason further about that.

According to Erikson, the stages of "initiative versus guilt" are from the ages of three to six.

Q    "Initiative versus guilt," can you talk a little bit more about those two pathways?

A    Yeah. That's when a child is beginning school usually. So the initiative would be, "Do you feel the confidence to take initiative in performing certain tasks?"

The guilt would be, "Do you feel like you made bad choices, that you do bad things?" So you'd rather not take initiative because you feel like you're going to do something wrong.

Q    So a child who feels guilt as opposed to initiative, how do we see that manifest itself outwardly, say as they go through school, for instance?

A    Probably wouldn't like school very much. Probably would be reluctant to try things, wouldn't reach their potential. Might be a child who dislikes school because they feel like they're not capable of doing things the right way and they would rather not even participate in it.

Q    When we see -- you talked about, I suppose, children who -- you said they are very egocentric so then they tend

1   to attribute both good and bad things that happened to
2   themselves.

3        How does that affect victims of childhood sexual abuse,
4   say, when the abuse comes to light and now there's a major
5   shift within the family?  How does the child victim perceive
6   that as it pertains to them?

7   A    I think they would perceive it as it's all their fault.
8   Even if other people are telling them, "This is not your
9   fault," with that rigid type of thinking, it would be very
10  hard to get them to believe otherwise.

11  Q    You say it's very hard, both with children who are one
12  and two and develop that mistrust and the older who are a
13  little bit older and develop egocentric belief that "bad
14  things are my fault."

15       How does one overcome that?

16  A    Well, according to Erikson, I guess you don't totally
17  overcome that.  That's something that would stick with you
18  for the rest of your life.

19       But in terms of how do you manage that, I think through
20  therapy and working through that.  And you may have to work
21  through that again and again and again because it has never
22  been totally resolved.

23       So even if you've had therapy when you're a child and
24  you've come to the point where you feel better and it's no
25  longer significantly affecting your life, when you're a

teenager, issues might come up again.  When you're in your

twenties, it might come up again.  When you're in your

sixties and you have grandchildren and you're thinking, "Oh,

my gosh, what if something happens to them," then those

issues might come up again.

Q    I see.  So it's a matter of management versus a cure?

A    Yes, I think so.  I think therapy helps of course,

support from other people, and other coping skills that a

client might develop that would help them.

Q    Now you've met two of the victims in this case, J.J.

and E.J.

A    Yes, I have.

Q    How did you prepare for your meetings with them before

you ever met?

A    I watched the videotapes.  I felt like these children

were so young that they might not be willing or able to

articulate to me what happened, so I felt it was important

to me going in that I had a sense of what they had been

through and what sorts of questions I should ask them.

      So I saw the tapes.  I had also --

          THE COURT:  When you say "the tapes," you are

talking about the tapes of the victimization?

          THE WITNESS:  Yes, I am.

          And I also interviewed their mom.

1  BY MS. SOLARI:

2  Q    Did you find viewing the videos to be informative as

3  far as formulating a plan to interview the children?

4  A    I found it to be disturbing, and I also found it to be

5  informative, yes, because as it turned out, their mom

6  doesn't know everything that happened.  So she couldn't have

7  told me.

8       And the kids -- J.J. does not talk about it, so she

9  wouldn't have told me.  And E.J., I think, is so young that

10  I don't think she would have been able to tell me very much.

11  Q    So as far as the video is concerned, as we talk about

12  your impressions and your opinions about these children and

13  their prognosis today, did you rely, at least in part, on

14  what you saw on the video to reach those conclusions?

15  A    Yes.

16  Q    Did you see behavior on the part of either girl in the

17  video that caused concern or that looked, perhaps,

18  maladapted or dysfunctional on the part of either victim?

19  A    Probably the worst thing to me is that they seemed so

20  accustomed to it.  It looked to me like each child was very

21  familiar with what was going on.  They didn't seem surprised

22  at all.

23       With J.J., she was actually taking initiative herself

24  to lead these games, which made me think at first these

25  games were done to her, and then she became familiar with

1  the process and then just kind of took over and took the

2  lead.

3      With each child, for the most part, they were going

4  along with everything like it was just a regular routine,

5  that it wasn't distressing to them at all.  That was more

6  disturbing to me than the distress because I was thinking

7  they don't realize there is something wrong with this.

8      There were a couple of times with each child where I

9  did see that they were disturbed by it.  At one point, E.J.

10 was crying.

11     And then with J.J., in one of the videos I saw, she

12 obviously tried to redirect the game.  She said something to

13 the effect of "We're not supposed to be doing that right

14 now," and she tried to change it.  But her Papa went ahead

15 with what he was doing in spite of her saying, "We're not

16 supposed to be doing this."

17 Q   What can you tell us about the prognosis for victims

18 like that who have been so accustomed to the abuse that to

19 them it seems perfectly normal?

20 A   I think that this will be a lifelong struggle for these

21 girls in terms of their trust, in terms of their

22 understanding of boundaries, understanding what is

23 appropriate and what's not.

24     I think that because of some of the things that were

25 said, that I think especially J.J. would remember, things

1  like, "No one would love you like your Papa loves you," I

2  think throughout her life she will be confused what love

3  means.

4       And I understand she says things to her mom, like if

5  her mom is taking care of a sibling, she'll say, "Well, you

6  don't love me any more," or "I'm going to leave because you

7  don't love me."

8       I don't think she understands what it means to be

9  loved.

10 Q    Did the behavior you saw in the video on the part of

11 J.J. give you any cause for concern about her ability to

12 play unsupervised with other children?

13 A    Absolutely, because I would be afraid that she would

14 repeat some of the play that she was taking initiative and

15 doing.

16      And because she won't talk about what happened to her

17 -- she has yet to talk about any of any of this.  She is

18 gradually developing a little bit more trust in me, but she

19 won't tell me anything specifically about the abuse.  So we

20 can't really get at that to talk about what is okay and what

21 is not okay.

22      And I would definitely supervise her around other

23 children.

24 Q    I'd like to talk some more about your meetings with

25 J.J.  Now you said she's not ready, apparently, to speak

1    about the abuse.

2        What is her emotional state and affect like when you

3    meet with her?

4    A    J.J. is a very angry child.  When I first met her, she

5    was oppositional.  I felt like she was pushing me away

6    through that oppositional behavior, even with something that

7    seemed to be a benign, pretty enjoyable activity like

8    playing a board game.  She ended throwing dice at me and

9    throwing the card games at me.

10       And we really weren't talking about any issues.  I

11   think that was just her way of disconnecting and trying to

12   push me away.

13       I still see her as a very angry child.

14   Q    I don't have children so I don't know the answer to

15   this question.  But is that normal for a child to just act

16   out and throw things at you in the middle of a session?

17   A    No.  I mean, I see a lot of children every day.  I've

18   got five children of my own.

19       It's normal for children to get angry sometimes, but

20   this was her just meeting me for the first time and me being

21   very friendly trying to establish rapport with her, and me

22   not pushing her to talk about anything that she didn't want

23   to talk about.

24       So it should have been a very friendly meeting.

25   Instead, she was angry for what an observer might think was

1   no apparent reason.

2          I think she was angry because she had some idea that

3   when you go into therapy, these are the things that you

4   might talk about.  And I think that brought up anger for

5   her, and I think it was her way of trying to push me away.

6          But no, I would not consider that normal at all.

7   Q    Have you talked to J.J. about her perception of

8   herself, how she feels about herself?

9   A    I think she feels terrible about herself.  I mean,

10  she's called herself stupid over little things, like she's

11  scratched a mosquito bite one day and it started bleeding.

12         And I said, "Oh, it's okay.  I'll get you a tissue."

13  And she was saying, "I'm so stupid.  That was a stupid thing

14  to do."

15         I think there is a strong dislike for herself.  She

16  talks about how none of the kids in school like her, talks

17  about it as though she thinks they shouldn't like her.

18  Q    How does she feel about going to school?

19  A    She doesn't like school.  She says she hates it,

20  actually.  The kids don't like her.  The teachers are mean,

21  doesn't like doing the work, doesn't like anything about it.

22  Q    In your opinion -- you talked earlier about shame and

23  guilt.  Can those feelings have anything to do with why

24  children may not want to go to school?

25  A    I think it would have a lot to do with that.  I think

she never developed the sense of autonomy, the sense of initiative that I was talking about in those stages.

I think that she, basically, has developed the self-concept that she's bad and she does things that are wrong. I think that has carried over to everything. I mean, it's carried over to school where she feels like she can't do things right there. It's carried over to peer relationships. It's carried over to family relationships.

She is very jealous of her younger sister to the point where I would say it's not normal. If I pay any attention to E.J., immediately she's saying, "I want her out of the room."

I think she just can't tolerate anything that makes her feel that she is not good enough because already feels so bad about herself.

Q   Did you receive any information about what, if anything, the Defendant said to J.J. to keep her from disclosing these games that they were playing?

A   I think he had told her he would go away and she would never see him again.

Q   In your opinion, what can be the effect of a statement like that to a young child when, in fact, the behavior is discovered and the Defendant does go away?

A   I think she would very much blame herself for that as well. And I think that would also prevent her from talking

1   about it in therapy, which is the thing that might

2   eventually help her get better.

3       But I would say it's probably still in her mind that

4   you just can't talk about this or it's going to be even

5   worse for him than it already is.

6   Q   Have you seen or received any information about any

7   inappropriate sexual behavior or sexual acting out by J.J.?

8   A   Her mother told me that there was a history of

9   masturbating with dolls and stuffed animals.  I understand

10  that that has stopped, but she has done that.

11      I think more recently she's just very excessively

12  modest.  She didn't want her mom to buy her a bathing suit.

13  She wanted a shirt and shorts instead, which would be

14  unusual, very unusual, for a child her age.

15  Q   Is anything else you would like to say about J.J.

16  before we talk about the immediate effects that you have

17  observed in E.J.?

18  A   Well, I'm just really concerned about her unwillingness

19  to talk about it, because I feel the very thing that might

20  help to make her some better she is adamantly opposed to

21  doing.

22  Q   Is there anything one can do to speed up that process,

23  or do we just have to wait until she's ready?

24  A   I don't know of a way to speed it up, other than I want

25  her to develop more and more trust in me.  I feel like

1    through coming every week and developing more and more of a

2    trusting relationship in the therapy room, I hope that

3    eventually she will be able to talk about things.

4         If I were to push her to talk about it, I think she

5    would just shut down even more than she has.

6    Q    So is what we're looking at here sort of a long-term

7    strategy versus a six month cure-all?

8    A    Very much, yes.

9    Q    And we will talk in a few moments about the potential

10   long-term effects that we may see in J.J. over the years.

11   A    Okay.

12   Q    But I'd like to talk to you about your meetings with

13   E.J. and what you have perceived about E.J., her behavior,

14   her attitudes that may be of concern to you that you can

15   share with the Court.

16   A    Well, for a very young child, I would say I can already

17   see that the boundaries are poor.  Most of the time when I

18   meet a child her age, they don't immediately jump into my

19   lap, and she did.

20        Upon meeting her for the first time, she just -- she

21   didn't even ask.  She just plopped into my lap, which one

22   might say, "Oh, that's friendly, and that's cute," but I

23   would also say is an indication that the boundaries just

24   aren't there.

25        And she has continued to do that.  Every now and then,

1   boom, she's just in my lap.

2       I understand from her mom that there have also been

3   boundary issues at home, taking off her little brother's

4   diaper in spite of mom telling her not to do that.  And it

5   appears that she's just taking off the diaper just to look

6   at him.

7       They've also been incidents, I understand from her mom,

8   of her inappropriately touching her younger brother.  She

9   has a history of excessive masturbation as well.

10      My biggest concern for E.J. at this point is just the

11  boundary issues.  She's too trusting.  It's indiscriminate.

12  Q   Have you seen or have you received any evidence that

13  E.J., despite her young age, recalls, to some extent, the

14  interaction, the sexual pay, the abuse that she was engaged

15  in with the Defendant?

16  A   I had asked if she remembered a grandfather.  And she

17  said she remembered Papa.  Other than that, she wouldn't

18  talk about him.

19      Now I understand from her mom that she has reported

20  memories of Papa peeing on her, she said, making her turn

21  around and tying her up.  According to her mom, I think

22  there's more memories than what she's said to me at this

23  point.

24  Q   So might it still be a trust issue; she's still not

25  ready to talk with you about the incidents yet?

1   A    It could be a trust issue.  It could be just that she's
2   so young she doesn't really know how to put it into words
3   when I ask the question.
4        I think when she said things to her mom, that was just
5   a spontaneous -- that's what came into her mind.
6        So unless she comes into my office and happens to
7   spontaneously say that, I don't know that my question is
8   going to elicit all of that because, at that age, I just
9   don't know that she'd be able to explain it.
10  Q    I see.  So I suppose one who doesn't know a whole lot
11  about these things, or doesn't have the experience you do,
12  might say, "Well, this child is so young that surely there
13  won't be any pronounced long-term effects of this behavior
14  upon her."
15       Would you agree or disagree with that assessment?
16  A    I would disagree.  I think there could be lifelong
17  effects of this.  I think that she does have some memories
18  of if.
19       And if you think about the developmental stages, this
20  all started at that sensory motor stage where she's forming
21  her framework for looking at the world, and looking at other
22  people, and thinking about the way that the other people
23  should treat her.
24       Also, if you look at Erikson -- that's the trust versus
25  mistrust stage -- yes, I think this could have an impact on

1    her for the rest of her life.

2    Q    With regard to both of these victims, based on your

3    experience and your education in this area, what long-term

4    effects might we expect to see in victims like these?

5    A    They are at risk for a number of things:  juvenile

6    delinquency, not reaching their potential in school,

7    dropping out of school, promiscuous behavior, being

8    revictimized themselves, acting out and victimizing other

9    children, substance abuse, eating disorders, reoccurrence of

10   depression, recurrence of PTSD symptoms.

11        I think they are at risk for a lot of things.

12   Q    Are those maladapted behaviors you see with significant

13   frequently in cases of prior sexual abuse?

14   A    Yes.

15   Q    How does one go about treating those things, whether

16   it's self-harm, self-medication, eating disorders?

17   A    If it's not as severe, you would do out-patient

18   therapy.  When you're talking about substance abuse and

19   eating disorders, you're talking about long term.  It's not

20   going to be a six-months cure either.

21        There may be a need for in-patient treatment in a

22   hospital.  There could be a need for residential treatment,

23   particular with something like substance abuse or eating

24   disorders.  They may need to go into longer term residential

25   treatment which could be six months to a year.

1    Q    Once someone has gone through a residential or an

2    in-patient treatment program for, say, substance abuse or an

3    eating disorder, are they typically cured forever after

4    that, or do you see relapses and recurrences?

5    A    There is high relapse rate among eating disorders and

6    substance abuse.

7    Q    You talked a little while back about potential

8    recurrences of issues or that the memories would reemerge as

9    these children grow up and become adults.

10        Can you talk about the types of things that might tend

11   to trigger the stress or the memories of these incidences?

12   A    I think significant, especially interpersonal, events

13   in their life when they are, oh, middle school age or high

14   school age and they start dating, and they begin to think

15   about what happens during dating relationships and how to

16   handle that.

17        When they're in maybe young adulthood and they are

18   thinking of establishing a long-term relationship with

19   somebody, the birth of a child, that could trigger a lot of

20   memories of what happened to them as children, their

21   concerns that this might happen to their own children, even

22   concerns way in the back of their mind, probably, that they

23   might offend against a child thinking, "Because this

24   happened to me, what if I do this to somebody else," not

25   that they necessarily would, but just that anxiety of "what

1    if I did that?"

2        This could happen when they're grandparents and there's

3    the birth of a grandchild.

4    Q    So do you have an opinion, Doctor, about whether it's

5    more likely than not that these two minors will need

6    counseling for the course of their natural lives?

7    A    I would think so.  I mean, I'm thinking it could be off

8    and on.  I'm not thinking this would be one week every

9    single year for the rest of their lives.

10       But I'm thinking this would be throughout their life,

11   off and on, they would need some sort of treatment.  Yes.

12   Q    Okay.  And, of course, as you said earlier, there's the

13   possibly for residential or in-patient treatment at some

14   point --

15   A    Yes.

16   Q    -- given their high risk status?

17   A    Yes.

18   Q    Does that typically cost less, the same, or more than

19   out-patient treatment therapy?

20   A    A whole lot more.  And insurance companies are often

21   reluctant to cover residential treatment.

22       There's also the possible need for medication.  J.J.

23   already has diagnoses of PTSD and major depression, which

24   are things that you could use medication for.  I'm trying

25   not to.  I'd rather hold off because she's young.  So I'm

1    hoping that therapy will be enough.

2         But if her insurance doesn't cover medication, that's

3    going to be expensive as well.

4         E.J. has a diagnosis of an anxiety disorder that could

5    possibly at some point require medication also.

6    Q    Doctor, since you're the expert, is there anything else

7    that you think would help inform the Court about these

8    victims' diagnoses, about their prognoses, or about their

9    long-term needs?

10   A    This was such an extensive history of abuse -- we're

11   talking about multiple acts.  We're talking about things

12   that they had been so accustomed to, that it's apparent on

13   the videotapes that they were just very familiar with this.

14        I am thinking that this is something that is going to

15   have an impact on them and their families for the rest of

16   their lives.  It is a life-altering experience or

17   experiences.

18        So it's hard for me to predict exactly how much therapy

19   they are going to need.  When I wrote my reports, I said

20   they would need it for at least the next year.  And then I

21   said it was very likely that they would need it at other

22   points throughout their lives.

23   Q    Your prediction about the next twelve months or so, did

24   that have anything to do with your knowledge of what, say,

25   an hour of therapy costs right now and probably for the next

1   year?

2   A     Well, yes.  I based my calculation on what it costs

3   right now.

4         In the future, I image the cost of therapy is going to

5   go up.  So I really can't project how much that's going to

6   be, say, twenty-five years from now.

7   Q     And how much does, say, an hour of therapy typically

8   cost right now?

9   A     I charge $120 an hour.

10            THE COURT:  $120 or $125?

11            THE WITNESS:  $120.  That's me, though.  Some

12  people charge more than that.

13            MS. SOLARI:  I pass the witness at this point,

14  Your Honor.

15            THE COURT:  Mr. Merritt, any questions?

16            MR. MERRITT:  Just a few, Your Honor.

17                        CROSS EXAMINATION

18  BY MR. MERRITT:

19  Q     Dr. Walther, please understand we don't disagree with

20  any of your testimony.  We're simply trying to help the

21  Court arrive at an amount that should be awarded as far as

22  restitution in this case.

23        First of all, I would like to know:  Have you prepared

24  any numbers that you have provided to the Government

25  regarding your estimation of future counseling costs?

1    A    There was a estimation of what it would cost for the

2    next year.  And then in my reports, I didn't say what it

3    would cost after that because I didn't know how much therapy

4    will cost in the future or exactly how much they might need.

5    Q    Right.  Let me ask this in a different way.

6         What are the number of sessions per week that you

7    recommend for the next year?

8    A    One session per week for each child.

9    Q    Do you anticipate that there would be required at least

10   one session per week for a lifetime?

11   A    No.  That's what I was just saying.  I don't see it as

12   being one session a week continuously for the rest of their

13   lives.  I'm thinking that they will need courses of therapy

14   off and on, and those courses would probably be longer term.

15        I'm thinking, you know, if they go into therapy, say,

16   two or three years from now, I don't think it would be

17   they're there for two months.  I'm thinking it might be

18   they're there for another year.

19   Q    I understand.

20   A    And I can't really predict how often throughout their

21   lives they would need that.

22   Q    But your testimony would be that it would be needed

23   during significant changes or other graduated socializations

24   in their life, such as progressing from grade school to

25   middle school?

A    Yeah.  I mean, it's hard for me to predict that, too,
what would trigger memories and trigger feelings for a
particular individual.  It could be they were in high school
and dating somebody and something happened in the course of
that relationship that reminded them of things.

So, I mean, it could be anything that triggers
something for that person.

Q    And how many -- I know that it's difficult to
estimate -- but how many, in your professional opinion, how
many of these changes may come up?  What would you say would
be the maximum number of things that would trigger
counseling sessions that would last for at least year?

A    I honestly cannot assign a number to that.  It would
vary so much depending on each person and the things that
happen in their lives that I really wouldn't feel
comfortable putting a number on it.

Q    Consequently, I guess, because of the difficulty in
estimating that number, it's almost impossible for you to
estimate what the total cost would be.

A    I'm not a real good mathematician to be honest with
you.

Q    I understand.

A    If I were better at that, maybe I could assign some
number to it if I sat down and I thought, "Well, possibly
they could need courses of therapy at this point.  Possibly

1  could need in-patient, medication, residential."

2       I could probably look at that and assign some amount,

3  ballpark figure, that I thought they might need.

4  Q    At the current time, neither of these children are on

5  any type of medication?

6  A    Correct.

7  Q    Is that correct?

8  A    Um-hmm.

9  Q    And there's no immediate need for in-patient treatment

10 for either child?

11 A    Not at this point.  There is also a high risk among

12 victims of sexual abuse of becoming suicidal at some point

13 in their lives.

14      If that were to happen at any point, which is hard for

15 me to predict too -- I mean, I certainly hope it doesn't

16 happen.  But I could say within the next month that could

17 happen with J.J.

18      And if something like that were to happen, then yes,

19 you would probably require hospitalization.

20 Q    There is a third victim in this case.

21      You have had no contact with that victim?

22 A    You are referring to --

23           THE COURT:  C.W.

24           THE WITNESS:  No, I have not.

25           MR. MERRITT:  I have no further questions, Your

1   Honor.  Thank you, Doctor.

2               THE COURT:  Ms. Solari, any redirect?

3               MS. SOLARI:  No, ma'am, Your Honor.

4               THE COURT:  Ms. Solari, before we ask this witness

5   to step down, do you have further testimony regarding the

6   numbers that you have presented for future --

7               MS. SOLARI:  With regard to future counseling?

8   I'm afraid I don't, Your Honor, and I know it's a difficult

9   issue.  I've talked to Dr. Walther at length about this.  To

10  be candid with the Court, we just can't quantify exactly how

11  much counseling these girls will need.  We understand it

12  will be a lifelong problem for them both with which they'll

13  struggle.  We can't know how many and how often they will

14  encounter triggers that will require them to go back.

15              I'm sorry, Your Honor, I don't have any more

16  evidence as to the numbers.

17              THE COURT:  Dr. Walther, knowing that this is not

18  an exact science that we are engaged in, but nonetheless,

19  looking for some scientific guidance from you, as to J.J.

20  the Government has submitted a restitution chart through

21  which it is requesting $416,000 for future loss treatments.

22              Is that number more probable than not a rationale,

23  reasonable number to assign as a restitution amount?

24              THE WITNESS:  That's a tough question.  I mean, it

25  really depends on what she might need.  You know, if she

1    needed residential and if she did not have insurance

2    coverage for that, we're talking -- she could use up

3    $100,000 like that.

4              THE COURT:  But not being able to see the future

5    with precise clarity, as none of us can, my question to you

6    is:  Would you think that the $416,000 listed by the

7    Government is approximately accurate, or too low, or too

8    high?

9              THE WITNESS:  I would probably give her more, to

10   be honest with you, not knowing for sure what's going to

11   happen with her.  She's so angry and so guarded now that I'm

12   really concerned about what the future holds for her.

13             THE COURT:  In your professional opinion, would a

14   future loss amount of $416,000 for the harm done to the

15   victim J.J. be a conservative amount?

16             THE WITNESS:  I would say it's conservative, yes.

17             THE COURT:  And the same question as to the minor

18   victim E.J., for that child, the Government has listed a

19   future loss request of $435,500.

20             Would that amount be a rational assignment of loss

21   value on the Government's part for E.J. --

22             THE WITNESS:  I would say that's low also.

23             THE COURT:  So you would opine that $435,000

24   figure for future loss is a conservative amount for E.J.?

25             THE WITNESS:  Yes.

1    THE COURT:  All right.  Mr. Merritt, any other

2  questions of this witness?

3    MR. MERRITT:  Again, I don't mean to be

4  repetitive, Your Honor.

5  BY MR. MERRITT:

6  Q    But the only numbers you provided to the Government

7  were your estimated costs for the first year of treatment --

8  A    Yes.

9  Q    -- and what you had done so far?

10  A    Right.  I felt more comfortable stating that as a

11  prediction than going all the way into the future.

12  Q    The $416,000 figure and the $435,000 are not amounts

13  that you provided to the Government?

14  A    No, sir, they're not.

15    MR. MERRITT:  No further questions, Your Honor.

16    THE COURT:  But in hearing those amounts as

17  suggestions by the Government, is it your professional

18  opinion that those would be rational, indeed conservative,

19  requests?

20    THE WITNESS:  I would say they are just too low

21  because I'm thinking we don't know how much therapy is going

22  to cost in the future.  We don't know how much -- that's for

23  out-patient.  We don't know how much it might cost for in-

24  patient, or residential, or medication.

25    We don't know whether their insurance would cover

1    it.  If they don't have insurance that covers that, then

2    they would be out of luck or they're going to have funds to

3    take care of it.

4            THE COURT:  All right.  Any further questions, Ms.

5    Solari?

6            MS. SOLARI:  No, Your Honor.

7            THE COURT:  You may step down.  Thank you.

8            THE WITNESS:  Thank you, Your Honor.

9            THE COURT:  Ms. Solari, call your next witness

10           MS. SOLARI:  Yes, Your Honor.  The Government is

11   going to excuse Dr. Walther.  May she be excused?  She has

12   appointments.

13           THE COURT:  Any objections?

14           MR. MERRITT:  No objection, Your Honor.

15           THE COURT:  All right.  She may be excused.

16           MS. SOLARI:  The Government calls Special Agent

17   Peter Amodeo.

18           PETER AMODEO, GOVERNMENT'S WITNESS, SWORN

19           THE CLERK:  You may be seated.

20           Please state your full name, spell your last,

21   state your business address and occupation for the record

22           THE WITNESS:  Peter Amodeo, A-M-O-D-E-O.  Special

23   agent with Homeland Security Investigations.  We're at

24   2 East Bryan Street, Suite 800, Savannah, Georgia.

25

DIRECT EXAMINATION

BY MS. SOLARI:

Q    Special Agent Amodeo, are you the case agent handling the investigation of the Defendant, Stephen Keating?

A    Yes, I am.

Q    As the case agent, have you had an occasion to execute warrants in this case, as well as to interview the Defendant?

A    I have.

         MS. SOLARI:  Your Honor, may I approach the witness?

         THE COURT:  You may.

BY MS. SOLARI:

Q    Special Agent, I have handed you Government's Exhibit 1.  Do you recognize it?

A    I do.

Q    Would you please tell us what it is?

A    This a disk which has a video on it.

Q    Who put the video on the disk?

A    I put the video on the disk.

Q    And how do you recognize that disk to be the one you made for us today?

A    It has my initials on it.

Q    How many videos are on the disk?

A    There's one video.

1  Q    Before I move to admit that into evidence, Special

2  Agent, could you please -- let's back up a little bit.

3       Did you participate in the execution of a search

4  warrant at the Defendant's residence in November of 2012?

5  A    I did.

6  Q    And also the execution of a search warrant at his place

7  of work in Riceboro, Georgia in the same month?

8  A    Yes.

9  Q    Did you seize any items of evidence from his place of

10 work?

11 A    We did.

12 Q    Generally, what were those?

13 A    Digital evidence, computer flash drives.

14 Q    Did you seize a thumb drive, as well, from his work

15 locker?

16 A    Yes.

17 Q    What did you do with that thumb drive after it came

18 into evidence?

19 A    After it came into evidence, we -- I specifically write

20 blocked the device so no data could be written to it or it

21 couldn't be changed.

22      I made a forensic image, or a copy, of that device and

23 put it into forensic software, and then viewed the contents

24 of that device.

25 Q    So with the write blocking and the use of the forensic

1 imaging software, are you satisfied that there were no

2 changes made to any of the evidence on the thumb drive when

3 you copied it?

4 A    Yes, I am.

5 Q    What, if anything, did you find when you reviewed the

6 electronic or the digital contents of the thumb drive?

7 A    Specifically, I found this video and other videos

8 depicting the Defendant engaged in sexual acts, in videos

9 and pictures, with minor children.

10 Q    Now let's talk specifically about the video that you

11 have downloaded onto that disk.

12      Did you review it to satisfy yourself that that is an

13 identical copy of the video you found on the Defendant's

14 thumb drive?

15 A    Yes, I did.

16 Q    Have you made to it any additions, deletions, or

17 modifications?

18 A    No, I have not.

19 Q    Is that video approximately ten minutes, fifty-four

20 seconds in length?

21 A    Yes.

22 Q    And the title of the video, or the file name, is MVI

23 [underscore] 0814 [dash] m-o-v?

24 A    That's correct.

25           MS. SOLARI:   Thank you.

1           Your Honor, at the time, the Government moves to

2    admit Government's Exhibit 1?

3           THE COURT:  Any objection?

4           MR. MERRITT:  No objection.

5           THE COURT:  Admitted without objection.

6       (Government's Exhibit Number 1 received in evidence)

7    BY MS. SOLARI:

8    Q    I'd like to change gears for a second here and talk

9    about your personal interactions with the Defendant.

10          You met with the Defendant following his guilty plea in

11   this case; is that right?

12   A    That's correct.

13   Q    What did you discuss with him at that time?

14   A    Well, we discussed with him the videos or pictures that

15   we had discovered on various media, as well as his email

16   accounts, and -- through the lead that we had received

17   originally from our Cyber Crime Center.

18   Q    Did you talk to the Defendant about whether he had ever

19   engaged in inappropriate sexual contact with minors other

20   than those you were already aware of at that time?

21   A    We did.

22   Q    What did he tell you?  Of course, not naming any names,

23   but just generally, what did he disclose to you?

24   A    During that encounter, he disclosed additional victims

25   that he had -- children that he had had sexual contact with

1  over a number of years.

2  Q    Just ballpark, about how many years back did these

3  events reach?

4  A    It went back approximately forty years.

5  Q    Given that some of these events were that old, can you

6  tell the Court anything about the level of detail with which

7  the Defendant was able to recall these encounters.

8  A    He was able to recall quite a few specific instances of

9  abuse of children and was able to recall them in quite

10  detail.

11  Q    Was the Defendant interviewed by an HSI agent after

12  your initial meeting with him?

13  A    He was.

14  Q    Was he asked during that interview about sexual contact

15  with minors?

16  A    Yes.

17  Q    Did he disclose to that agent any additional victims?

18  A    He did.

19  Q    All told, Special Agent Amodeo, I'd like the Court to

20  know, of all the victims the Defendant disclosed the sexual

21  abuse of minors over his lifetime, how many of those victims

22  were direct or distant family members of the Defendant

23  himself?

24  A    I believe there were seven that were related to the

25  Defendant.

1    Q    How old was the Defendant's youngest victim?

2    A    Less than one year old.

3    Q    Did you ever ask the Defendant what, if anything he did

4    to keep any of these victims from telling someone about the

5    abuse?

6    A    We did.

7    Q    What did he tell you?

8    A    Specifically, one of the children, he had told them not

9    to tell because he would be -- he would get in trouble and

10   that he would be sent away for a long time.

11   Q    Now after HSI learned of the existence of the

12   significant number of victims, was there any action taken to

13   make notifications to these people or their families?

14   A    Yes, there was.

15   Q    Why did you do that?

16   A    Well, we felt like -- we wanted the parents and, in

17   some cases, the victims themselves if they were adults to

18   know what happened to be able to get any kind of counseling,

19   medical treatment, or anything that could possibly help

20   them, and also give them a list of services that were

21   available for them to help them out.

22   Q    How did you go about making those notifications?

23   A    On all but one occasion, we met with them face-to-face,

24   the victims or the family members.  On one occasion, I did

25   do a telephonic notification that was insistent.

1    Q    At the victim's insistence?

2    A    At the victim's insistence, yes.

3    Q    How many victims or families did you successfully

4    notify?

5    A    I believe we were up to ten as a total.

6    Q    Now another topic for you.  I would like to talk with

7    you about the effect of the distribution of the images in

8    this case.

9         Based on the evidence you reviewed, these images were,

10   in fact, distributed via email or some other means that put

11   them sort of out in the ether; is that right?

12   A    That's correct.

13   Q    And these images have appeared on the internet?

14   A    Yes.

15   Q    Is there any way you know of that we can now collect

16   all the copies in existence of those images and remove them

17   entirely from the internet?

18   A    Not that I'm aware of.

19   Q    What steps, if any, will your agency, ICE, take to help

20   law enforcement track any further distribution or possession

21   of these illicit images?

22   A    Well, we will make sure that all the images that we

23   have get to the National Center for Missing and Exploited

24   Children, and they will be able to track any other law

25   enforcement officers who submit these images during their

1 investigations and will be able to see if there is any

2 matches of other child pornography collectors.

3 Q   So if and when there is a match and we find that these

4 victims' images have been collected and viewed once again,

5 to the best of your knowledge, will these victims or their

6 family receive any notice of that?

7 A   I believe it's upon their request to be notified, but

8 they can be notified.  They can be notified by the U. S.

9 Attorney's Office or other law enforcement.

10          MS. SOLARI:  Thank you, Special Agent.

11          Your Honor, I will pass the witness and ask that

12 we be allowed, at the appropriate time, to publish that

13 video to the Court.

14          THE COURT:  All right.

15          Mr. Merritt, any questions?

16          MR. MERRITT:  I have no questions, Your Honor.

17          THE COURT:  Ms. Solari, if you will begin the

18 publication process then.

19          MS. SOLARI:  Your Honor, for the record, if I may

20 say so, this is a video that I think some may argue

21 constitutes child pornography.  The Government is not

22 certain that that's the case, but we offer it nonetheless

23 because we believe it's informative to the Court to show the

24 effects of this conduct on at least one of the victims.

25          Again, for the record, the monitors have been

1   turned away at counsel table so that no one in the gallery

2   can see the video.  It's available only to the witness, and

3   to the Court and the court staff.

4        (Videotape playing)

5             MS. SOLARI:  That's all the Government has of this

6   witness, Your Honor.

7             THE COURT:  Mr. Merritt, any further questions for

8   this witness?

9             MR. MERRITT:  No, Your Honor.

10            THE COURT:  You may step down.  Thank you.

11            MS. SOLARI:  The Government has no further

12   evidence, Your Honor.

13            THE COURT:  All right.  Counsel, we are going to

14   take a brief ten minute break.  During that break, I want

15   you to confer on the restitution amount and see whether, in

16   light of the testimony of Dr. Walther, if there are any

17   revisions that the Government would like to make regarding

18   the amounts particularly as it relates to the calculation

19   for the one-year projection given the revised per hour

20   charge that she has made, additionally if there are any

21   agreements or stipulations that the Defense can make with

22   the Government regarding the projected future amounts as

23   well.

24            We will be in recess until approximately 2:30.

25        (Recess at 2:24 p.m. until 2:38 p.m.)

1          THE COURT:  All right.  Have counsel had the

2     opportunity to confer regarding the restitution amount?

3          MR. MERRITT:  We have, Your Honor.

4          THE COURT:  Is there any stipulation possible?

5          MR. MERRITT:  Not with regard to the minor

6     victims, Your Honor.

7          THE COURT:  All right.

8          MS. SOLARI:  Your Honor, the Government has

9     adjusted that projected figure for the one-year projection

10    and the projection until the age of seventy to account for

11    the hourly rate of $120 dollars as opposed to $125.  I

12    believe Probation has submitted the updated figures for the

13    Court's consideration.

14         Also, Your Honor, I was remiss in not doing this

15    earlier, and I apologize.  The Government, if possible,

16    would like Government Exhibit 1 to be held under seal.

17         THE COURT:  Any objection to that, Mr. Merritt?

18         MR. MERRITT:  No, Your Honor.

19         THE COURT:  Exhibit 1 will be held under seal

20    given the contents.  I find that is appropriate.  It shows

21    minor victim's face, and it will be under seal.

22         All right.  Any argument regarding restitution,

23    Mr. Merritt?

24         MR. MERRITT:  Yes, Your Honor, just briefly.

25         THE COURT:  Yes.

1        MR. MERRITT:  Your Honor, as I stated previously

2  to the Court, we certainly are not opposed to the issue of

3  restitution and encourage the Court to award it in this

4  case.

5        The problem that we have in representing this

6  Defendant is the manner in which the restitution has been

7  calculated.  My argument will be brief.  There are two cases

8  I would bring to the Court's attention.  One is a Ninth

9  Circuit 2011 case, *United States verse Kennedy* in which

10  other cases are quoted and says that federal courts

11  throughout the country have struggled considerably with

12  interpreting the restitution provision of the statute.

13        But in *Kennedy*, the Court set forth the factors

14  that should be considered in order to award restitution,

15  which include that the individual seeking restitution is a

16  victim.  We don't have any problem with that.  These minors

17  are clearly victims.

18        That the Defendant's offense was a proximate cause

19  of the losses.  We certainly don't have a problem with that.

20        But the third one says that the losses so caused

21  can be calculated with some reasonable certainty.  When we

22  asked Dr. Walther had she provided any numbers to the

23  Government, she said no.  The numbers that the Government

24  has provided to the Court today are just that.  It's their

25  numbers.

1        And I understand it's an estimate they are

2    submitting to the Court, but there is no reasonable

3    certainty to back that up.  Dr. Walther indicated that if

4    she sat down and took some time, she could probably provide

5    a more accurate amount.  I know the Court asked her if these

6    amounts were reasonable in her opinion, and she opined that

7    they were rather low.

8        There's one other case that we would point out to

9    the Court, which is *U. S. versus Lundquist,* 847 F.Supp. 364,

10   which is a 2001 case.  This was a similar type case, but the

11   restitution requested in that case included a detailed

12   assessment and evaluation by a forensic psychologist -- and

13   we don't have any objection to Dr. Walther's assessment --

14   which recommended a therapy plan for weekly treatments with

15   additional periods of time of more intense treatment

16   sessions over the course of a lifetime.

17       The estimates of those future treatments was

18   calculated by an economist who can estimate life

19   expectancies of victims.

20       In this case, we have chosen an arbitrary number,

21   Your Honor, of age seventy for both victims that have

22   different ages.  We've chosen an arbitrary amount of the

23   cost of weekly sessions for the period of one year each and

24   every year until age seventy.

25       So our argument is very basic.  It is that this

1    calculation is not reasonable.  Suggestions --

2              THE COURT:  According to the witness, it might be

3    unreasonably low.

4              MR. MERRITT:  Yes.

5              THE COURT:  So you are advocating for a higher

6    amount?

7              MR. MERRITT:  Well, I'm advocating for something

8    more certain, Your Honor.  I'm certainly not advocating for

9    a higher amount.  It could possibly be lower.  I'm simply

10   advocating for a more certain amount.

11             I'm not asking the Court, by any means, to reject

12   the issue of restitution.  Again, we're not opposed to that.

13   I would simply ask for a more certain calculation.  I think

14   Dr. Walther can give us that.  It may be a double-edged

15   sword.  It may come back higher than the numbers the

16   Government has suggested.  But I think she said she could do

17   that given some time.

18             I would simply suggest to the Court not to reject

19   the idea of restitution but to leave that issue open and ask

20   Dr. Walther for a more specific recommendation, and then

21   allow the Court to consider that.

22             THE COURT:  Thank you, Mr. Merritt.

23             MR. MERRITT:  Thank you, Your Honor.

24             THE COURT:  Ms. Solari?

25             MS. SOLARI:  Your Honor, I hear Defense asking for

a more certain amount of restitution, and I think the thing

of which we can be certain is, as the Court has noted, these

amounts that have been put forth by the Government are low.

The witness said that in no uncertain terms, that she

believes, if anything, these amounts undercut the future

amount of the victims' losses when one takes into account

the probable need of residential and in-patient treatment at

various periods over the course of their lives, medication,

and we certainly know they're going to need repeated

prolonged sessions of out-patient therapy.

So based on her own expertise, she has told us

that this amount, if it is reasonable, it is slightly low

and certainly a conservative estimate.

The amount is not one just sort of plucked from

the ether by the Government.  This is based on Dr. Walther's

hourly amount.  We first took that from her written report

that was provided to the parties, and we figured that to be

$125 per hour simply for out-patient treatment.  We have now

adjusted that to $120 per hour.

And as Dr. Walther testified, any sort of

residential or in-patient therapy would be exponentially

more expensive than that $120 an hour rate.

So, again, Your Honor, the Government believes

this figure is reasonable to address the victims' future

losses.

1          THE COURT:  Thank you.

2          THE COURT:  Mr. Merritt and Mr. Keating,

3     reapproach.

4          Aside from what I will classify as an objection to

5     the amount of restitution for future losses sustained by the

6     two minors, are there any other objections to the facts or

7     to the application of the advisory guidelines as contained

8     in the Presentence Report and its addendum?

9          MR. MERRITT:  No, Your Honor.

10         THE COURT:  Is that right, Mr. Keating?

11         THE DEFENDANT:  Yes, Your Honor, that's correct.

12         THE COURT:  There being no objections to the

13     factual statements contained in the Presentence Report and

14     its addendum, I will adopt those statements as my findings

15     of fact.  And there being no objection to the probation

16     officer's application of the advisory guidelines, I will

17     adopt those conclusions, and therefore determine, in Mr.

18     Keating's case, the applicable advisory guidelines are a

19     Total Offense Level of 43, a Criminal History Category of I.

20     That is 1,320 months of imprisonment, a term of supervised

21     release of five years to life, a $25,000 to $250,000 fine, a

22     $400 special assessment.

23         As to restitution, restitution is due in this

24     case.  It is clear what the restitution amount is for what

25     all agree to be the victims who have reached the age of

1   majority.  As to Jessica Johns, that amount is $1,138.65.

2   As to Lisa Keating, that amount is $14,119.49.  As set forth

3   in what I am going to mark as Government's Exhibit 2, which

4   is the five-page recalculated Keating Restitution Chart

5   submitted by the Government at the end of our break moments

6   ago, those amounts of restitution are hereby ordered.

7       (Government's Exhibit Number 2 received in evidence)

8           THE COURT:  As to the minor victim J.J., it is

9   clear that the loss-to-date amount of $995, and as to E.J.,

10  the loss-to-date amount of $330 -- I'm sorry -- of $1,138 --

11  no -- $330 is correct and is due and owning.

12          As to the future loss amount of one year

13  projected, for J.J. the amount of $8,590.40 is hereby

14  ordered due and owing.  As to E.J., the amount of $8,590.40

15  is likewise ordered as proper restitution.

16          As to the amount of the future loss, I hereby find

17  that, based on the testimony given today, it is proper and,

18  in fact, needed to order restitution for both minor children

19  for their anticipated future loss as testified to by

20  Dr. Walther and admitted and stipulated to by the Defense.

21          There is going to be significant need for

22  significant future treatment proximately caused by the

23  victimization that this Defendant caused to these two girls.

24  I am going to hold the record open in order to allow the

25  Government to set forth an appropriate formula to the extent

1   that Dr. Walther did indicate in court that she may be able

2   to do that.

3           To use as a proxy for what that treatment might be

4   of one session per week may not be the best approximation of

5   what is due.  The Court is concerned that Dr. Walther

6   indicated that the actual projected future loss may be well

7   in excess of what the Government has been able to submit to

8   this point.  Rather than assign too little of a restitution

9   amount, or to assign it based on perhaps not the most

10  precise formula available, or anticipated formula available,

11  would not be prudent at this point.

12          So I will allow the Government a period of

13  fourteen days from today's date to submit any report on

14  behalf Dr. Walther regarding the future loss.  I will allow

15  the Defendant a period of seven days from that point to

16  object, and we will thereafter schedule a hearing on that

17  restitution for future loss for those two witnesses only.

18          Any questions regarding that restitution?

19          MS. SOLARI:  None from the Government, Your Honor.

20          THE COURT:  Mr. Merritt?

21          MR. MERRITT:  In the meantime, Your Honor, if

22  there should be a meeting of the minds concerning that

23  issue, can we submit that to the Court?

24          THE COURT:  I will consider that.

25          MR. MERRITT:  Thank you, Your Honor.

1          THE COURT:  Yes.

2          As to the statutory penalties, as to each of

3     Counts Eight, Thirteen, and Fourteen, by statute, there is a

4     minimum of fifteen years of imprisonment, and by statute, a

5     maximum of thirty years imprisonment per count.  As to Count

6     Fifteen, by statute, there is five years minimum prison and

7     a maximum of twenty years imprisonment.

8          I will state for the record that I did have the

9     opportunity to receive, and read, and review victim letters

10    that were submitted to the Court.  I have studied those

11    prior to the sentencing hearing.

12         But Ms. Solari pursuant to the Victim Witness Act,

13    are there any victims present today that would like to be

14    heard at this time?

15         MS. SOLARI:  No, Your Honor.  They would like to

16    rely on the statements they submitted to the Court.

17         THE COURT:  All right.  And I have considered

18    those.

19         Mr. Merritt, are there any witnesses or any

20    evidence that you would like to present in mitigation of

21    sentence, or is there any argument you would like to make in

22    mitigation of sentence?

23         MR. MERRITT:  No witnesses, Your Honor.  I would

24    like to make a brief argument in the form of an apology,

25    although there is no apology which could ever be sufficient

1    in this case for the acts that my client has committed.  But

2    on his behalf -- and he would like to make a brief statement

3    also if the Court will allow.

4            THE COURT:  I will.  He has the opportunity to

5    address me last.  So before I turn to the Government, and

6    ultimately to Mr. Keating, this is your turn to speak.

7            MR. MERRITT:  Yes, ma'am.  We would offer an

8    apology to the victims and their families for these horrible

9    acts that he has committed against these young children.

10   They should know that he feels remorse because of that, that

11   he realizes his actions have affected not only these

12   children but these children's families of which he is a

13   part.  He has basically destroyed his family, Your Honor,

14   and he's very much aware of that.  He wants them to know

15   that.

16           He stands before Your Honor about to be sentenced

17   knowing that he's probably going to spend the rest of his

18   life incarcerated, and he understands that.  And he doesn't

19   feel the remorse because of that.  He feels the remorse

20   because he understands the implications of his actions upon

21   these children.

22           We have no way -- and we're not trying to mitigate

23   his actions in any way.  The only thing we can attribute it

24   to, Your Honor, is, as shown in the Presentence Report, this

25   is some undiagnosed condition he's had for a number of

years.  Again, he is sorry.  And we apologize to these

victims and their families.

THE COURT:  All right.  Ms. Solari, on behalf of

the Government?

MS. SOLARI:  Yes, Your Honor.  I'd like to make an

argument just briefly.

Your Honor, it takes so very little to devastate

the world of a child.  These children, to whom this man was

everything, the damage, as we heard Dr. Walther testify, is

immeasurable.  In the short-term, the effects that they are

already experiencing are anger, shame, self-loathing,

mistrust.

These are such small children.  And Dr. Walther

testified one of them doesn't even understand the concept of

love or know what it really is.  They have a belief that all

the bad things in the world that happen are their fault.

And we've heard that they will carry these with them in the

long-term.  These are indelible impressions on the minds of

these children.

In the long-term, they're at high risk for things

like suicide, delinquency, substance abuse and other self-

harm, promiscuity, and revictimization.

Your Honor, these children are going to be for

some period of time that we can't yet fathom victims of

their own childhood.  They have been used and betrayed, and

ultimately, they were left by the person they truly believed

loved them the most.

So how can these children ever trust another

person again?  How can a child feel normal when everything

they've been taught about how to love, how to play, how to

touch is completely wrong?

And their photos that are on the internet are

going to serve as a constant reminder of their abuse at the

hands of this Defendant and the fact that there are so many

other people like him who revile in the images of this

abuse.

As they get older and as they begin to get better,

so we hope, if they elect to be notified, we will rip the

scab off every time we find another perverse collector of

these images out there.  We will let them know, and we will

rip off that healing scab to remind them of this abuse.

One day, when they're old enough, these victims

will probably come to understand something no normal person

should ever have to consider, and that is the staggering

magnitude of this perverse problem, the number of people out

there who are like this and who collect the images of this

abuse.  It's something no child or adult should ever have to

consider.

We know, Your Honor, that they need counseling.

As Dr. Walther testified, this is a problem that's going to

plague them for the rest of their lives, as they change

schools, as they mature, as they meet other children, as

they start to date, as they enter into a physical

relationship, a marriage, have children of their own, as

their children reach maturity, as they have grandchildren --

again and again and again, these life events will impair

their healing.

In the video, Your Honor, I think maybe the best

testament as to how badly these children have been damaged,

it is sickening to watch a child respond in that manner to

the sexual advances of a fifty year old man.  And it is

nothing short of infuriating to know that he made them that

way.  He groomed them, and he manipulated them, and he

subtly coerced them to respond that way.  He taught them

that it was a game.

Any person who watches that video, expert or not,

can only hope and prey that there is something in this world

that can begin to make those children right again.  We don't

have a time machine and we don't have something that will

magically erase their memories.  So counseling is the best

we can do and hope that somebody can break through their

anger and their pain and their mistrust and try to teach

them how to be normal.

There are other victims in this case as the Court

well knows, and those are the families.  This Defendant, as

Your Honor can see in the Victim Impact Statements, was a wolf in sheep's clothing who preyed upon a bereaved family who lost a son, a husband, and a father.

And he did that by preying on the most vulnerable members of this family.  He stepped in, supposedly, to fill that void, to be the man in their life, to teach these children what a man and what a father figure would be.  And he did it in such an utterly disgusting way, Your Honor.  He used them as objects for his own sexual gratification, and that's how he rewarded this family for making him one of their own.

Now these family members carry the unbearable mantle of guilt for bringing him into the fold, for creating opportunities for him to be alone with these children, for hearing these children say, "I don't want to go with Papa today," and telling them, "It will be okay.  Go with him.  It will be fine."  And now they know it was never fine.  It was always horrible.

And now their guts churn and their heads ache while they try to figure out how they could have seen it and if there was some other way they could have stopped it sooner.  That is what these family members have to live with for the rest of their lives.

So an apology to the family?  No, thank you, Your Honor.  I think they'd rather not.  This is something

horrible that will haunt them forever because the Defendant,
for his own sexual gratification, used their children to his
own purposes.

And even as adults, who we typically think of as a
thousand times more resilient than children, this guilt and
this fear and this disgust has seeped out and has manifested
itself in nightmares, in paranoia, and in physical ailments
of these family members who are so burdened by this stress
that it has literally made them sick. This is how these
people have to function day to day based on the actions of
the Defendant.

This Defendant, Your Honor, is a serial predator
who has preyed upon, apparently, every child he's managed to
get alone for more than a couple of minutes since he was the
age of twelve years old. God only knows what creates in a
man a propensity to do something like that. But we know to
a certainty that he will reoffend if ever given the
slightest opportunity to do so. No child has ever been, or
will ever be, safe in his presence.

And, Your Honor, it's strange that it was almost
fortunate in a way for the Defendant how this played out in
that he was debriefed by HSI on two different occasions, and
he got to recount in graphic detail every episode of
molestation, fifteen different victims over the span of his
lifetime. He got to remember it, and he got to retell it as

many times as he wanted to and in as much detail.  He got to

relive all of them over and over again.

And in doing that he's now relieved from any

burden of harboring those secrets.  Now he's placed that

burden on those families, on the ten families who had their

phone ring, or who had a knock at the door from HSI that

their child has been molested.  He has dumped the weight of

the world on these families in reliving these instances, and

recounting them in detail, and relieving himself of the

burden of carrying it as a secret.  He has dumped the weight

of the world on these families of these other victims.

He's left nothing but pain and destruction and

betrayal in his wake.  He is broken inside, and he's wrong

in the head.  And he couldn't keep it to himself, so he

acted it out time and time again, child after child, and

family after family, and now everyone is broken.

The Defendant faces a statutory maximum term of

imprisonment of 110 years.  That simply represents the

lifetime that these victims will endure trying to repair

what he has utterly destroyed.

Your Honor, the sentence recommended by Probation,

1,320 months confinement, a lifetime of supervised release,

and restitution for the four victims in this case is the

right sentence.  There is nothing anyone can ever do to make

these victims whole again, but that sentence is the best

1    that we can do for them today.

2              THE COURT:  Thank you, Ms. Solari.

3              Well, Mr. Keating, it is your right to address me

4    last.  Is there anything you would like to say in mitigation

5    of punishment before I pronounce punishment?

6              THE DEFENDANT:  Your Honor, not necessarily in

7    mitigation of punishment, but just that I recognize that my

8    victims were innocent children that loved me and trusted me,

9    and I took advantage of that love and trust in a horrible

10   way and victimized them.  And in doing so, I victimized

11   their entire family and my entire family.

12             And there is nothing I can do or say now to lessen

13   the pain and sorrow that I've caused all those people.  All

14   I can do is say that I'm sorry and I hope that they don't

15   suffer permanently and that all of them, the victims and the

16   other family members, can somehow get over this and have

17   some kind of a normal life and just forget about me.

18             That's all I can say.

19             THE COURT:  Well, I have studied the Presentence

20   Report and its addendum and the exhibits that were submitted

21   today.  I have studied the letters submitted by and on

22   behalf of the victims.  I have listened to the arguments of

23   counsel and the statement of the Defendant.  And I have

24   looked back and considered and sought to apply every single

25   part of our federal sentencing statute, 18 USC § 3553, and

1  all of the considerations that I should take into account in

2  trying to fashion a sentence that is enough and not too

3  much.

4        I will say to those victims that are present here

5  in the court that there is one person who caused all the

6  harm that has been wrought on you and the ones too young to

7  be here, and it is not any of you.  It is the Defendant and

8  the Defendant alone who is responsible for your pain and

9  your suffering -- just that person.

10        It is the judgment of the Court that that person,

11  Stephen Keating, is hereby committed to the custody of the

12  Bureau of Prisons to be imprisoned for a term of 1,320

13  months.  That term is comprised of a term of 360 months as

14  to each of Counts Eight, Thirteen, and Fourteen, and as to

15  Count Fifteen, a term of 240 months.  Each of those terms

16  are to be served consecutively.

17        I find no reason to depart from the sentence

18  called for by application of the advisory guidelines given

19  the extent and repetition and gravity of the offenses that

20  undeniably occurred.  Sixty-six years in federal prison with

21  no hope of parole is an appropriate sentence.

22        Restitution is due as I made clear earlier.  I

23  have found that the Government has proven by a preponderance

24  of the evidence the proximate cause necessary to make such

25  an award for past and for future losses.  The one detail

regarding the amount of the future restitution for the two

minor victims is left open for the amount of time indicated.

Pursuant to 18 USC § 3664(f)(3)(B), nominal

payments toward that restitution shall be made either in

quarterly installments of a minimum of $25 if working

non-UNICOR, or a minimum of 50 percent of monthly earnings

if working UNICOR shall be made.

In the event this Defendant is ever released from

imprisonment and while he is on supervised release, the

nominal payments of a minimum of $250 per month shall be

made, and those would be made payable to the Clerk, U. S.

District Court for ultimate disposition to the victims.

I have determined that it is inappropriate for the

Defendant to pay interest, so that interest requirement is

waived.  And after considering the factors set forth in

5E1.2(d), no fine is imposed.  The special assessments,

which are mandatory, are due.  That is $100 per count for a

total of $400, which is due immediately made payable to the

United States.

My consent order of forfeiture, which was entered

back on February 5th, 2013, is hereby incorporated into this

judgment by specific reference.  As a result, the Defendant

shall forfeit his interest in the FujiFilm FinePix camera,

the Nikon camera, the Canon PowerShot camera, a 16 gigabyte

SanDisk, a 1998 Suzuki Samuri, an Apple MacBook Pro laptop

computer, a Nikon camera, a Sony camera, an Aspire 1 laptop,
a Dell studio laptop, a Toshiba Satellite laptop computer,
a Seagate external hard drive, and a Toshiba external hard
drive.

As I understand it, Mr. Merritt, you have conceded
to the forfeiture of those items; is that correct?

MR. MERRITT:  Yes, we have, Your Honor.

THE COURT:  If the Defendant should ever be
released from the custody of the Bureau of Prisons, he will
be on supervision release for a term of life.  While on
supervised release, he must comply with the standard
conditions of supervision adopted by the Court and the
mandatory conditions required by 18 USC § 3583.

Those include urine testing, a prohibition against
possession of any firearm.  He must cooperate in the
collection of a DNA sample, participate in a program of drug
and alcohol testing, not tamper with any testing device,
attend and participate in a mental treatment program,
including sex offender treatment, the costs to be borne by
him.  He would be required to participate in random
polygraph examinations, the cost to be borne by him.  He is
not to possess, access, subscribe to, or view any videos,
magazine, literature, photographs, images, drawings, video
games, or internet websites depicting children or adults in
the nude or engaged in sexual activity.

He shall never have contact with anyone under the

age of eighteen unless accompanied by a responsible adult

preapproved by the probation officer who has been apprised

of Mr. Keating's criminal history.  By "contact," that

includes person-to-person, over the telephone, through the

mail, over the internet, and third-party contact.

Again, he is ordered to register as a sex offender

with the appropriate federal, state, and local authorities.

If he were to ever be released, he would be

subject to the searches required by the Court or by the

probation officer.

Additionally, he shall not possess or use a

computer with access to any on-line service at any location

without prior written approval of the probation officer.

The probation officer is hereby directed to

provide Mr. Keating with a written statement that sets forth

all of the conditions of any supervised release.

I did accept the plea agreement because I am

satisfied that what remains adequately captures the

seriousness of the underlying federal criminal violations

without in any way undermining the statutory purposes of

sentencing.

Pursuant to that plea agreement, it is hereby

ordered that Counts One of Indictment 12-22, and Counts One

through Seven, Nine, Ten, Eleven, Twelve, and Sixteen of

1    Indictment 12-23 be dismissed as to this Defendant.

2         Mr. Keating, pursuant to the plea agreement, with

3    limited exceptions, you waived the rights conferred by

4    18 USC § 3742 to appeal the sentence and to collaterally

5    attack the sentence on any grounds.

6         Sentence has now been pronounced.  Other than any

7    objections which could have heretofore been made, do you now

8    have any objections as to my findings of fact, my

9    conclusions of law, or to the manner that sentence in which

10   sentence was pronounced?

11        MR. MERRITT:  None from the Defendant, Your Honor.

12        MS. SOLARI:  None from the Government, Your Honor.

13        THE COURT:  All right.  Mr. Keating, I am going to

14   remand you to the custody of the U. S. Marshal.  And we will

15   be in recess until such time as I receive the updated

16   submissions regarding restitution.

17        MR. MERRITT:  Thank you, Your Honor.

18      (Recess at 3:14 p.m.)

19

20

21

22

23

24

25

1          CERTIFICATION

2

3          I certify that the foregoing is a true and correct

4     transcript of the stenographic record of the above-mentioned

5     matter.

6

7     *Norma Hatfield*

8

9     _____          Janury 8, 2015

10    Norma Hatfield, FPR, Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25